987 So.2d 23 (2008)
Earl WYCHE, Petitioner,
v.
STATE of Florida, Respondent.
No. SC05-1509.
Supreme Court of Florida.
July 10, 2008.
*24 Nancy A. Daniels, Public Defender, and G. Kay Witt, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Petitioner.
Bill McCollum, Attorney General, Robert R. Wheeler, Assistant Attorney General, Bureau Chief, and Charlie McCoy, Senior Assistant Attorney General, Tallahassee, FL, for Respondent.
WELLS, J.
We have for review Wyche v. State, 906 So.2d 1142 (Fla. 1st DCA 2005), in which the First District Court of Appeal certified conflict with the Fourth District Court of Appeal's decision in State v. McCord, 833 So.2d 828 (Fla. 4th DCA 2002). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. For the reasons expressed below, we approve the First District's decision in Wyche that affirmed the denial of the motion to suppress and distinguish the Fourth District's decision in McCord that affirmed the granting of the motion to suppress.

FACTS AND PROCEDURAL HISTORY
The facts of this case are set forth in the opinion of the First District:
While Wyche was detained in Columbia County for a probation violation, Lake City Police Department Investigator Clint VanBennekom asked Wyche for a saliva sample, stating that he was suspected of committing a burglary at a Winn-Dixie supermarket. In fact, VanBennekom had manufactured the fictitious Winn-Dixie burglary in order to obtain Wyche's consent to take swabs for a sexual-assault investigation. No DNA match was obtained in the sexual-assault case; as a consequence, Wyche was exonerated as to it.
During VanBennekom's investigation, Lake City Police Department Investigator Joseph Moody was also investigating a [burglary[1]] of The Pink Magnolia, a *25 gift shop in Lake City, and asked VanBennekom to send the saliva swab that he had obtained to the FDLE lab for a comparison with blood drops taken from the crime scene. FDLE acquired a match. Based on the results, Wyche was accused of the [burglary]....
Wyche, 906 So.2d at 1143. Wyche then filed a motion to suppress the saliva swabs and DNA test results, arguing that VanBennekom gained his consent through trickery and that suppression was appropriate pursuant to the Fourth District's decision in State v. McCord, 833 So.2d 828 (Fla. 4th DCA 2002). Wyche, 906 So.2d at 1144.
In McCord, a police investigator was investigating a series of robberies that he suspected McCord had committed. McCord was in county jail on unrelated charges. The investigator told McCord that he was a suspect in a rape case and that DNA evidence could exclude him from the rape investigation. This rape case was invented by the investigator. McCord gave a saliva sample. DNA from this sample matched blood recovered at the scene of one of the robberies, and McCord was charged with the robberies. McCord filed a motion to suppress the DNA evidence on the ground that his consent was involuntary and obtained in violation of his due process rights as a result of the investigator's deceit in telling him that the DNA would be used in a rape investigation. The trial court granted McCord's motion to suppress. McCord, 833 So.2d at 829. The State appealed the granting of the motion to suppress, and the Fourth District affirmed. Id. at 831.
In contrast, in Wyche, the trial court denied the defendant's motion to suppress and granted the State's motion for denial "on its face."[2] Wyche was tried and convicted of burglary, grand theft, and criminal mischief. Wyche then appealed his convictions to the First District, contending that the trial court erred by denying his motion to suppress evidence of the saliva swabs and DNA test results and by denying his motion for judgment of acquittal on the charge of grand theft. Wyche, 906 So.2d at 1143. The First District affirmed the conviction, expressly declining to follow the Fourth District's decision in McCord and certifying conflict. Id. at 1144.

STANDARD OF REVIEW
The standard of review for motions to suppress is that the appellate court affords a presumption of correctness to a trial courts findings of fact but reviews de novo the mixed questions of law and fact that arise in the application of the historical facts to the protections of the Fourth Amendment.[3]Fitzpatrick v. State, 900 So.2d 495, 510 (Fla.2005). The conflict *26 issue to be resolved in this case is whether the defendant's motion to suppress must be granted because the police investigator told the defendant that his DNA was needed in the investigation of a fictitious burglary. We review this legal question de novo.

ANALYSIS
Our analysis begins with Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), in which the Supreme Court wrote:
Similar considerations lead us to agree with the courts of California that the question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent. As with police questioning, two competing concerns must be accommodated in determining the meaning of a "voluntary consent"  the legitimate need for such searches and the equally important requirement of assuring the absence of coercion.
A few years later, in United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), the Supreme Court reaffirmed its holding that the voluntariness of a defendant's consent to search is a question of fact to be determined from the totality of the circumstances. In that case, the Supreme Court found that a defendant's consent to search was voluntary, explaining:
There was no overt act or threat of force against Watson proved or claimed. There were no promises made to him and no indication of more subtle forms of coercion that might flaw his judgment. He had been arrested and was in custody, but his consent was given while on a public street, not in the confines of the police station. Moreover, the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search. Similarly, under Schneckloth, the absence of proof that Watson knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance. There is no indication in this record that Watson was a newcomer to the law, mentally deficient, or unable in the face of a custodial arrest to exercise a free choice. He was given Miranda [v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),] warnings and was further cautioned that the results of the search of his car could be used against him. He persisted in his consent.
Id. at 424-25, 96 S.Ct. 820 (footnote omitted). This Court has likewise held that the issue of whether consent is voluntary under the Fourth Amendment is to be determined from the totality of the circumstances. See, e.g., Washington v. State, 653 So.2d 362, 364 (Fla.1994).
The motion to suppress in this case was based upon stipulated facts. The stipulated material circumstances were:[4]

*27 1. Wyche was in custody (on an unrelated charge).
2. Police were investigating a rape, and Wyche was a suspect.
3. To obtain DNA for the rape investigation, Wyche was told that the police were investigating a burglary of a Winn-Dixie grocery store and was asked to give saliva swabs that could be tested for DNA and used in the Winn-Dixie investigation.
4. The Winn-Dixie burglary was made up by the investigator.
5. The saliva swab cleared Wyche in the rape investigation.
6. The saliva swab was given to another investigator who was investigating a burglary at The Pink Magnolia, a gift shop where Wyche had worked.
7. The saliva swab did have a positive match with the DNA from The Pink Magnolia burglary.
8. The DNA match was then sought to be used in the prosecution of The Pink Magnolia burglary.
The focal issue is whether the fact that Wyche consented to the saliva swabs upon being told that the DNA sample was for use in a fictitious burglary investigation requires that the saliva swabs containing Wyche's DNA not be used in the prosecution of an actual burglary. As Schneckloth frames the issue: was the consent to the saliva swabs under these circumstances voluntary or coerced?
Though Washington did not involve a fictitious investigation, our decision in Washington did involve the similar issue of whether a biological sample collected in one investigation may be used by police in an unrelated investigation. While he was incarcerated on other charges, Washington was interviewed by a detective and two police officers. Washington did not know and the officers did not tell him that he was suspected in the beating death of a ninety-three-year-old woman. The police interviewed Washington regarding an unrelated sexual battery. The officers told Washington that hair and blood samples could prove or disprove his guilt in the sexual battery case, and Washington provided the requested samples. When the State sought to use the samples in the murder prosecution, Washington filed a motion to suppress the samples. Washington, 653 So.2d at 363-64. On appeal, this Court considered the totality of the circumstances and found that Washington's consent to the collection of the samples was voluntary. Id. at 364. The fact that Washington had not been informed that he was a suspect in the murder case did not render his consent involuntary.
We further held in Washington that once the samples were validly obtained, they could be used in the unrelated murder prosecution. Id. Thus, Washington established that when a defendant validly consents to the giving of the bodily substance, whether saliva, hair, or blood, for use in a criminal investigation, the characteristics of the substance can be used in investigations unrelated to the one for which the defendant was told the sample was collected. This holding is logical because the DNA profile derived from a bodily substance like saliva, hair, or blood is a constant identifying fact that does not change or disappear.
As in Washington, Wyche's consent to search was requested for the purpose of investigating one alleged crime, and the results of the search were used in the investigation and prosecution of another crime. In both cases, the defendants consented to the collection of bodily fluids after being told that the samples were to be used in a criminal investigation. The circumstances of Wyche's consent are actually less concerning than the circumstances *28 in Washington because Wyche was told that the requested saliva swab was to be used in investigating a burglary, and the saliva was in fact used to investigate and prosecute a burglary. Wyche was not misled into thinking that DNA evidence would not be relevant to a burglary investigation, a crime one may not intuitively associate with biological evidence, and the saliva swabs were not used in the investigation and prosecution of some other type of crime  except to clear Wyche in the rape investigation.
The only issue not clearly resolved by Washington is whether Wyche's otherwise apparently voluntary consent was rendered involuntary by the fact that the Winn-Dixie burglary and investigation were fictitious.[5] For Wyche to prevail on his motion to suppress, we would have to hold that the sole fact that Wyche was told that the saliva swabs were to be used in the investigation of a fictitious burglary made his consent to the saliva swabs coerced, although the circumstances of Wyche's consent were otherwise similar to Washington's consent. We do not believe that suppressing the saliva swabs and the DNA test results on the basis of this one fact conforms to the totality of the circumstances analysis mandated by Schneckloth and Washington.
Moreover, as the First District discussed in its opinion, to hold that the police officers' invention of a Winn-Dixie burglary rendered Wyche's consent involuntary would not be in accord with the holdings of the United States Supreme Court and this Court that police deception alone does not negate voluntariness. In Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), the Supreme Court held that a confession was voluntary where the defendant received partial warning of his constitutional rights, the questioning was of short duration, and the defendant was a mature individual of normal intelligence, despite the fact that the police had misrepresented the substance of a codefendant's statement. In Fitzpatrick v. State, 900 So.2d 495, 511 (Fla.2005), this Court upheld a trial court's denial of a motion to suppress a statement induced by a detective's false suggestion that he would be able to arrange a satellite system to show that the defendant was at the scene of the crime. In Conde v. State, 860 So.2d 930, 952 (Fla.2003), we found the defendant's confession voluntary where a detective exaggerated the amount of DNA evidence against the defendant. In Davis v. State, 859 So.2d 465, 472 (Fla.2003), we held a confession voluntary even though the defendant claimed police officers informed him that they were investigating a missing person's case when in fact they were investigating a murder. In Nelson v. State, 850 So.2d 514, 521-22 (Fla.2003), we held a confession voluntary where an investigator wrote "DNA evidence" on a "pro and con" list on a board during an interrogation even though DNA analysis had not yet been performed on the evidence collected for DNA testing. In Escobar v. State, 699 So.2d 988, 994 (Fla.1997), we affirmed the trial court's denial of a motion to suppress a confession where "police detectives deluded [the defendant] before he gave his statements by falsely stating that they had obtained physical evidence and by failing to inform him that he could be sentenced to death." Finally, in Burch v. State, 343 So.2d 831, 833 (Fla.1977), we upheld the admission of a confession when the police misrepresented to the defendant that the defendant's partner in crime had confessed.[6] *29 Like any voluntariness analysis, these cases were decided by reviewing the totality of the circumstances. See Schneckloth, 412 U.S. at 233, 93 S.Ct. 2041 ("[I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.").
Our decision to affirm the First District's holding in the instant case is consistent with these precedents. The First District correctly considered police deception as one of many factors to be reviewed when analyzing the voluntariness of consent. We agree with the First District's findings that:
[Wyche] was clearly aware of the fact that the officer wanted the DNA sample in order to investigate a crime, and the officer did not misrepresent the fact that he had no search warrant. The officer did not indicate that appellant had no choice regarding whether to provide a DNA sample. Appellant did not acquiesce to a claim of lawful authority.
Wyche, 906 So.2d at 1147. Wyche was not a stranger to police procedure, and he knew that his DNA was requested for use in a criminal investigation. Wyche was not deluded as to the import of his consent to search or as to the intensity of the search. The police were very explicit as to what they were searching for, saliva swabs from which to extract Wyche's DNA. Given these factors, we further agree that the custodial setting of Wyche's consent and the investigator's failure to inform Wyche of the actual purpose of the search were not factors so controlling as to overpower Wyche's will. See Watson, 423 U.S. at 424, 96 S.Ct. 820 ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search.") We find that Wyche's consent was "the product of an essentially free and unconstrained choice by its maker." Schneckloth, 412 U.S. at 225, 93 S.Ct. 2041.
Moreover, Wyche's case materially differs from cases in which consent has been held not valid due to a coercive show of authority, such as Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). In Bumper, law enforcement officers told the defendant's grandmother, with whom the defendant lived, that they had a search warrant to enter the house. The officers did not have a search warrant. The Supreme Court held:
When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion  albeit colorably lawful coercion. Where there is coercion there cannot be consent.
Id. at 550, 88 S.Ct. 1788. Wyche was never told that the investigator had a warrant for the saliva swabs. To the contrary, *30 Wyche was asked to consent and did consent to the saliva swabs for use in a burglary investigation. Investigator VanBennekom truthfully represented that the police desired a sample of Wyche's DNA for purposes of an ongoing investigation. Wyche was informed that the requested evidence could match or exclude him in respect to a crime and that he was a suspect in a police investigation. Thus, Wyche was not deluded as to the import of his consent to the saliva swabs.
Wyche's case also materially differs from cases such as Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), and Samuel v. State, 898 So.2d 233 (Fla. 4th DCA 2005), where a consent to search or a confession was found to be involuntary because the defendant was promised some benefit or lack of repercussion for giving his or her consent or confession. In Lynumn, the Supreme Court found the defendant's confession to be involuntary where, while surrounded in her apartment by three law enforcement officers, she confessed "only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not `cooperate.'" 372 U.S. at 534, 83 S.Ct. 917. In Spano, the Supreme Court found the defendant's confession to be involuntary where he was questioned "until almost sunrise" by a series of law enforcement officers and district attorneys who ignored Spano's requests for counsel and played on his sympathies by falsely informing him that the job of one of the officers, a childhood friend of Spano, was in jeopardy because of Spano. 360 U.S. at 322-23, 79 S.Ct. 1202. The childhood friend played the "part of a worried father, harried by his superiors" who could benefit from Spano's confession for over an hour to obtain the desired confession. Id. at 323, 79 S.Ct. 1202. In Samuel, the defendant was suspected of having committed between seven and nine robberies, but a law enforcement officer told Samuel that he was suspected in fifteen robberies and that if Samuel "discussed the five or six robberies, he would not charge him with the others." 898 So.2d at 235. The Fourth District held that the confession was involuntary because the defendant did not reveal the specifics of the robberies until after the officer's promise not to prosecute. Id. at 237.
In contrast to those cases, the stipulated facts in the instant case do not demonstrate that Wyche was induced to consent by threat or promise.[7] While recognizing that a promise or threat need not be "direct" to invalidate consent, see Almeida v. State, 737 So.2d 520, 524 (Fla.1999), this Court has held that informing a suspect of potential charges against him does not constitute a threat to prosecute or a promise not to prosecute if the suspect cooperates. For example, in Peterka v. State, 640 So.2d 59, 67 (Fla.1994), we held that the defendant's consent was given voluntarily where the law enforcement officer "truthfully informed Peterka of the different degrees of homicide and that law enforcement was seeking to charge him with first-degree murder" and the record showed that the officer "made no promises of leniency in return for any statements, did not threaten Peterka, and did not use *31 violence to induce the statements." Here, Investigator VanBennekom informed Wyche that he was suspected of committing a burglary, albeit a fictitious burglary, and requested a saliva sample. He did not threaten Wyche or make any promises of leniency in exchange for Wyche's consent. Accordingly, no threat or promise influences our evaluation of the totality of the circumstances of Wyche's consent.
While we approve the First District's decision in Wyche, we distinguish rather than disapprove the Fourth District's decision in McCord. We find that there are circumstances in McCord upon which that court could have determined under the totality of the circumstances that McCord's consent was coerced.
McCord was suspected in a substantial number of robberies. While McCord was in custody on unrelated charges, an investigator told him that he was a suspect in a rape, which was fictitious, and that a saliva sample could exclude him from the rape investigation. At no time did the investigator tell McCord that he was a suspect in the robberies. McCord was thereafter charged in the robberies, and the saliva sample was used in the prosecution. The investigator testified that he believed McCord consented to the saliva sample only because he wanted to clear his name in the fictitious rape case. This candid testimony supports a finding that the investigator's deception caused McCord to feel coerced into consenting.
While we do not believe that a defendant's consent to a search should be interpreted as being conditioned on the resulting evidence being used only in investigations of crimes that the defendant knows that he or she did not commit, we recognize that a defendant's understandable desire to clear his or her name of the stigma of a rape accusation is a circumstance to consider. McCord's being told that he was a suspect in a serious sex crime for which DNA could clear him is a circumstance relevant to the analysis of whether McCord's consent was voluntary or coerced that distinguishes McCord from the instant case. The trial court in Wyche could have reasonably concluded that being accused of burglary does not entail the same pressure as being accused of rape. Again, the analysis is based upon the totality of the circumstances.

CONCLUSION
In sum, we approve the First District's decision to affirm the trial court's denial of Wyche's motion to suppress the saliva swabs and the DNA test results on the basis of our analysis of the totality of the circumstances and for the reasons set forth in this opinion. However, we do not disapprove the Fourth District's decision in McCord because that decision likewise properly defers to the trial court's factual findings and considers the totality of the circumstances surrounding McCord's motion to suppress.
It is so ordered.
QUINCE, C.J., and CANTERO and BELL, JJ., concur.
BELL, J., specially concurs with an opinion, in which QUINCE, C.J., concurs.
ANSTEAD, J., dissents with an opinion, in which PARIENTE and LEWIS, JJ., concur.
LEWIS, J., dissents with an opinion, in which ANSTEAD and PARIENTE, JJ., concur.
BELL, J., specially concurring.
Given the limited, stipulated facts of this case and the reality that this Court's decision is constrained by applicable United States Supreme Court precedent, I concur *32 with the majority opinion. However, I must write separately to make it clear that my concurrence is with serious reservations. As is Justice Anstead, I am disturbed by the level of intentional police misrepresentation in this case. Such tactics, if they were to become commonplace, would destroy the integrity of the criminal justice system.
This type of intentional deception by law enforcement risks "the criminal law [being] used as an instrument of unfairness." Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). As the Supreme Court explained,
"voluntariness" has reflected an accommodation of the complex of values implicated in police questioning of a suspect. At one end of the spectrum is the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws.... At the other end of the spectrum is the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice.
Id. at 224-25, 93 S.Ct. 2041 (citations omitted).
My hope is that law enforcement will resist the temptation to interpret this decision as an endorsement of intentional deception as acceptable, routine police practice. Indeed, the indiscriminate use of such tactics poses "a real and serious threat to civilized notions of justice." Id.
QUINCE, C.J., concurs.
ANSTEAD, J., dissenting.
For the reasons expressed below, I would quash the First District's decision in Wyche v. State, 906 So.2d 1142 (Fla. 1st DCA 2005), and would approve the Fourth District's decision in State v. McCord, 833 So.2d 828 (Fla. 4th DCA 2002).

PROCEEDINGS TO DATE
Wyche was detained in Columbia County for a probation violation and was questioned by Investigator Clint VanBennekom. Wyche, 906 So.2d at 1143. Although without proof or evidence of any kind, VanBennekom suspected that Wyche may have committed a sexual assault that was pending investigation. Id. In order to induce Wyche to provide a saliva sample to conduct a DNA test, VanBennekom made up a story that Wyche was a suspect in a local supermarket burglary. Id. In reality there had been no such burglary, but VanBennekom implied that he could be cleared as a suspect in the burglary if he submitted a DNA sample. Id. at 1148 (Ervin, J., dissenting). Wyche complied and provided VanBennekom with the saliva sample. Id. at 1143 (majority opinion). VanBennekom then tested the sample for a match with DNA obtained from the sexual assault and found no such match. Id.
However, the use of the DNA did not stop there. Aware that Wyche's DNA profile had been secured, Investigator Joseph Moody asked VanBennekom for Wyche's sample to compare it to blood drops taken from the crime scene of a recent but unrelated burglary[8] of a gift shop in Lake City. Id. This time the DNA test revealed a positive match connecting Wyche to the gift shop burglary, and Wyche was subsequently charged and convicted *33 of burglary, grand theft, and criminal mischief. Id. During those proceedings Wyche sought to suppress the DNA evidence, asserting the deception of the police in securing his saliva sample. Id. He relied on the Fourth District's decision in McCord, which held that suppression was appropriate in such circumstances. Id. at 1144. Despite McCord's binding effect on the trial court,[9] the motion to suppress was denied. Id. at 1143. Wyche appealed his convictions to the First District, which addressed only whether the trial court erred in denying Wyche's motion to suppress the saliva sample. Id. The First District affirmed the conviction and expressly declined to follow the Fourth District's decision in McCord and certified conflict with it. Id. at 1144. Judge Ervin dissented. Id. at 1148-49 (Ervin, J., dissenting).
In McCord, police suspected the defendant of committing a string of armed robberies. 833 So.2d at 829. While the defendant was detained on unrelated charges, police falsely informed him that he was a suspect in a fictional rape case and asked him to provide a saliva sample in order to exonerate himself. Id. The defendant provided the sample, and, rather than comparing the DNA in the bogus rape case, the police tested the sample against DNA recovered from the scene of several armed robberies. Id. Although the DNA matched the blood found at the scene of the robberies, the trial court refused to admit the DNA evidence on the grounds that the defendant's consent to the DNA testing was not voluntary because of the police deception. Id. On appeal, the Fourth District affirmed:
[T]he detective in this case fabricated a rape charge to obtain McCords consent. Even the detective testified that McCord consented to giving a sample only because he wanted to clear his name in a non-existent case. We agree with the trial court that this deception, while McCord was in jail, was so manipulative that his "consent" did not "validate the search."
Id. at 830.

STANDARD OF REVIEW
An appellate court must give a presumption of correctness to the trial court's ruling on motions to suppress with regard to the trial court's findings of fact, but the appellate court should independently review the mixed questions of law and fact that ultimately arise in determining whether the protections provided by the Fourth Amendment have been violated. Fitzpatrick v. State, 900 So.2d 495, 510 (2005) (quoting Nelson v. State, 850 So.2d 514, 521 (Fla.2003)); see also State v. Glatzmayer, 789 So.2d 297, 302 n. 7 (Fla.2001) ("[T]he ultimate ruling [on a motion to suppress] must be subjected to de novo review but the court's factual findings must be sustained if supported by competent substantial evidence."). Moreover, unless a ruling turns exclusively on an issue of fact, or for instance whether there was a factual dispute regarding whether any consent was actually given, the ultimate question of the voluntariness of consent to a search may become a legal rather *34 than a factual question, to which a de novo standard applies. Connor v. State, 803 So.2d 598, 608 (Fla.2001). In this case, for example, there is no dispute about whether consent was given; instead, the dispute is whether the consent was voluntary.

ANALYSIS
The Fourth Amendment of the United States Constitution states that it is "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable seizures ... and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Evidence obtained in violation of the Fourth Amendment shall not be admissible at trial. See Mapp v. Ohio, 367 U.S. 643, 657, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) ("[T]he exclusionary rule is an essential part of both the Fourth and Fourteenth Amendments...."); Sing v. Wainwright, 148 So.2d 19, 20 (Fla.1962) ("This Court long ago concluded that evidence obtained as the product of an unreasonable search is not admissible in a criminal proceeding. Florida has long recognized the so-called `exclusionary rule' regarding the inadmissibility of such evidence." (citing Thurman v. State, 116 Fla. 426, 156 So. 484 (1934); Jackson v. State, 87 Fla. 262, 99 So. 548 (1924); Chacon v. State, 102 So.2d 578 (Fla.1958))).
Extractions of bodily fluids, as occurred in this case, implicate essentially the same principles applicable to searches and seizures. Schmerber v. California, 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Further, once samples are obtained validly, they can be used for investigations of other crimes. Washington v. State, 653 So.2d 362, 364 (Fla.1994) ("We also find that once the samples were validly obtained, albeit in an unrelated case, the police were not restrained from using the samples as evidence in [a different] case.").
In order to comply with the Fourth Amendment, a search and seizure must be conducted with probable cause and with a warrant, "subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Moreover, "[i]t is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Hence, the issue this Court must address in the present case is whether Wyche's initial consent to give the saliva swabs was given voluntarily and freely.

CONSENT TO SEARCH
When the State desires to rely upon consent to justify a search, the State has the burden of proving that the consent was freely and voluntarily given, and showing mere acquiescence to authority is not enough to discharge this burden. Bumper v. North Carolina, 391 U.S. 543, 548-49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); see also Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (holding that the State must prove consent was voluntary, not simply a submission to authority); Jorgenson v. State, 714 So.2d 423, 426 (Fla.1998) (holding that the State must prove voluntariness by a preponderance of the evidence (citing Brewer v. State, 386 So.2d 232, 236 (Fla.1980))). Moreover, the State has the burden of proving that the consent was "not the result of duress or coercion, express or implied." Schneckloth, 412 U.S. at 248, 93 S.Ct. 2041. Voluntariness is a question of fact, which is to be determined from the totality of all of the circumstances. Id. at 248-49, 93 S.Ct. 2041.
*35 The voluntariness of a consent to search should be evaluated in much the same fashion as the voluntariness of a confession. Washington, 653 So.2d at 364 ("Although a warrantless search is per se unreasonable under the Fourth Amendment, the search will be considered lawful if conducted pursuant to consent which was given voluntarily and freely." (citing Norman v. State, 379 So.2d 643 (Fla.1980))); see also Schneckloth, 412 U.S. at 223-24, 93 S.Ct. 2041 (turning to the body of case law about the voluntariness of confessions in order to evaluate the meaning of voluntariness in the context of a consent to search). "The standard for measuring the scope of a suspect's consent [to search] under the Fourth Amendment is that of `objective' reasonableness  what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (citing Illinois v. Rodriguez, 497 U.S. 177, 183-89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). "[W]hile [the courts] have enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a sine qua non of effective consent, as it is axiomatic that `[w]here there is coercion, there cannot be consent.'" United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996) (citation omitted) (quoting Bumper, 391 U.S. at 550, 88 S.Ct. 1788, and citing Florida v. Bostick, 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). In essence, the inquiry is whether the consent was "the product of an essentially free and unconstrained choice by its maker." Schneckloth, 412 U.S. at 225, 93 S.Ct. 2041.
The voluntariness of consent has been addressed by the courts in a variety of contexts. For example, it has been held that knowledge of a right to refuse a search is not a prerequisite of a voluntary consent to search. Id. at 234, 93 S.Ct. 2041; see also United States v. Drayton, 536 U.S. 194, 206, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (holding that defendant's consent to search his person while on board an interstate bus was voluntary even though the police did not tell the defendant of his right to refuse consent); Ohio v. Robinette, 519 U.S. 33, 39-40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (holding that a detained defendant's consent to search his car was voluntary even though the police did not tell him he was free to leave).
On the other hand, the United States Supreme Court has held that consent will be considered involuntary if given in response to a police assertion of an intent to search the premises. See Amos v. United States, 255 U.S. 313, 317, 41 S.Ct. 266, 65 L.Ed. 654 (1921) (holding that consent was coerced when officers told defendant's wife they came to search the premises and she allowed them to enter). Similarly, consent has been deemed to be coerced when the police demand entry onto private premises. See Johnson v. United States, 333 U.S. 10, 13-14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (holding that when entry is "demanded under color of office" and consent is given "in submission to authority rather than as an understanding and intentional waiver of a constitutional right," consent is not voluntary). Further, consent has been determined to be invalid and involuntary where the police falsely assert that they have a valid search warrant. See Bumper, 391 U.S. at 548-50, 88 S.Ct. 1788 (holding consent involuntary when police told defendant's grandmother they had a search warrant and she allowed them to enter and search).
In Royer, a case originating in Florida, the United States Supreme Court invalidated a consent obtained by airport narcotics agents during an illegal detention of a passenger and his luggage:

*36 First, it is submitted that the entire encounter was consensual and hence Royer was not being held against his will at all. We find this submission untenable. Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment. These circumstances surely amount to a show of official authority such that "a reasonable person would have believed he was not free to leave." United States v. Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870 (opinion of Stewart, J.).
460 U.S. at 501-02, 103 S.Ct. 1319 (plurality opinion). The Court affirmed the Third District Court of Appeal's "conclusion that Royer was being illegally detained when he consented to the search of his luggage, [and] agree[d] that the consent was tainted by the illegality and was ineffective to justify the search." Id. at 507-08, 103 S.Ct. 1319 (plurality opinion); see also Reynolds v. State, 592 So.2d 1082, 1086 (Fla.1992) (finding a handcuffed defendant's consent to search his person involuntary, even though he was informed that he could refuse to consent, because he had been confronted by three officers and told he was under arrest even though there was no probable cause, and he was then handcuffed and frisked).
On the other hand, in United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), the Court concluded that a consent to a search of a suspect's car obtained while the suspect was in lawful custody was voluntary. The Court outlined the factors relevant to its analysis:
There was no overt act or threat of force against Watson proved or claimed. There were no promises made to him and no indication of more subtle forms of coercion that might flaw his judgment. He had been arrested and was in custody, but his consent was given while on a public street, not in the confines of the police station. Moreover, the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search. Similarly, under Schneckloth, the absence of proof that Watson knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance. There is no indication in this record that Watson was a newcomer to the law, mentally deficient, or unable in the face of a custodial arrest to exercise a free choice. He was given Miranda warnings and was further cautioned that the results of the search of his car could be used against him. He persisted in his consent.
Id. at 424-25, 96 S.Ct. 820 (footnote omitted) (emphasis supplied); see also United States v. Mendenhall, 446 U.S. 544, 557-59, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (holding that a defendant's consent to accompany DEA agents from the Detroit airport to the DEA office was voluntary when she was asked to accompany the officers, there were no threats or show of force, and the officers told her twice that she could decline to consent).

POLICE DECEPTION OR MISREPRESENTATION
This Court and other courts have held that not all deception will invalidate a confession. Denmark v. State, 95 Fla. 757, 116 So. 757, 762 (1928); see also Hoffa v. United States, 385 U.S. 293, 301-02, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (holding that defendant's statements made to an *37 informant were admissible even though the informant lied about his identity); Brown v. Brierley, 438 F.2d 954, 955-57, 959 (3d Cir.1971) (holding a consent voluntary when a defendant, who had been warned of his rights and knew police were investigating murders, turned his gun over to a policeman who suggested that he could sell the gun for the defendant).[10] In Conde v. State, 860 So.2d 930 (Fla.2003), we held that when a detective exaggerated the amount of DNA evidence against the defendant, the defendant's confession was still voluntary because "police misrepresentations alone do not necessarily render a confession involuntary." Id. at 952. We concluded that the deception was minimal because the police had a preliminary match between blood taken from the defendant and DNA evidence collected at the murders, and the defendant had voluntarily given his blood sample within a couple of hours of his arrest. Id. Therefore, when examined under the totality of the circumstances, we held that the confession was not rendered involuntary. Id.
However, we have also declared that deception is an important factor to be taken into account when determining whether a consent is voluntary, depending on the level of deception involved.[11] In Thomas v. State, 456 So.2d 454 (Fla.1984), we explained:
A confession that is obtained by coercion may not be used in evidence. Brewer v. State, 386 So.2d 232 (Fla. 1980). Techniques calculated to exert improper influence, to trick, or to delude the suspect as to his true position will also result in the exclusion of self-incriminating statements thereby obtained. Blackburn v. Alabama, 361 *38 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897); Frazier v. State, 107 So.2d 16 (Fla.1958); Harrison v. State, 152 Fla. 86, 12 So.2d 307 (1943). To render a confession inadmissible, however, the delusion or confusion must be visited upon the suspect by his interrogators; if it originates from the suspect's own apprehension, mental state, or lack of factual knowledge, it will not require suppression. See State v. Caballero, 396 So.2d 1210 (Fla. 3d DCA 1981); Ebert v. State, 140 So.2d 63 (Fla. 2d DCA 1962).
Id. at 458 (emphasis supplied). Similarly, we cautioned in Johnson v. State, 660 So.2d 637 (Fla.1995), that voluntariness may be negated and suppression of evidence mandated where the defendant makes a showing of "physical or psychological coercion, intentional deception, or a violation of a constitutional right." Id. at 642 (emphasis supplied) (citing State v. Sawyer, 561 So.2d 278 (Fla. 2d DCA 1990); Martinez v. State, 545 So.2d 466 (Fla. 4th DCA 1989)); accord Commonwealth v. Slaton, 530 Pa. 207, 608 A.2d 5, 9 (1992) ("Consent must be freely and intelligently given, however, and is not voluntary if it is obtained through deception as deception amounts to implied coercion, which negates the necessary element of willingness." (citing United States v. Prudden, 424 F.2d 1021 (5th Cir.1970))). Despite our cautions and, with the exception of cases like Bumper, our case law has done little to provide concrete examples of when such trickery or intentional deception will render a consent involuntary.[12]

THIS CASE
Whether the Fourth Amendment was violated in this case turns on a determination of whether Wyche freely and voluntarily consented to providing a sample for DNA analysis as contemplated by Schneckloth, or whether his consent was the product of "trickery" or "intentional deception" as contemplated in Thomas and Johnson. I would conclude that the degree and the flagrant nature of the deception intentionally used by the police to secure Wyche's consent prevented that choice from being "the product of an essentially free and unconstrained choice by its maker." Schneckloth, 412 U.S. at 225, 93 S.Ct. 2041. In common terms, Wyche was tricked into giving a sample by the use of intentional deception specifically crafted to secure the consent. This appears to be precisely the kind of police misconduct contemplated by our statements in Thomas and Johnson.
The State cites and the majority opinion relies on Washington for the proposition that a DNA sample secured in one case may be used in an investigation of another case. However, while the defendant in Washington was implicated in and convicted of a different crime from the one as to which he consented to provide a sample, the use of the DNA sample was approved in the other case only after it was determined to have been properly obtained in the first instance. There was no issue of trickery or intentional deception. The focus in Washington was on the continuing use of a validly obtained DNA sample, whereas the focus in McCord and Wyche was on the voluntariness of the consent to provide a sample in the first instance. The characteristic that distinguishes between McCord and Wyche on the one hand and Washington on the other is that in *39 both McCord and Wyche, the defendant gave a DNA sample to be tested for a completely fabricated crime so that the DNA testing would be certain to clear him.
The circumstances of this case more closely resemble the circumstances presented in Bumper. In Bumper, the defendant's live-in grandmother consented to the police search of his house only after the officers falsely claimed they had a search warrant. 391 U.S. at 546, 88 S.Ct. 1788. The Supreme Court held that this search violated the Fourth Amendment because the consent given was involuntary when predicated upon a false claim of the existence of a warrant. Id. at 550, 88 S.Ct. 1788. In other words, the consent was vitiated because it was obtained by the invocation of a critical but false representation.
Similarly, although no claim of a warrant was involved, Wyche consented to a search here pursuant to a false police promise that the saliva sample would provide the means to exonerate him as to any participation in a burglary of a local supermarket. However, the supermarket burglary case was actually a fiction, an intentional deception concededly created solely for the purpose of inducing the defendant to provide a DNA sample. Because it could only result in the defendant's exoneration of participation in a nonexistent crime, the defendant had everything to gain and nothing to lose. Of course, this is precisely why this particular deception was intentionally used by the police to induce the defendant to provide the sample. I would conclude that, as in Bumper, consent simply cannot be established as having been given freely and voluntarily when it is predicated upon such a critical misrepresentation.
A comparison of cases from other courts to the instant case further supports my conclusion. Several courts have addressed the voluntariness of a consent to search where the police have fabricated a crime or said that the object of a criminal investigation was something other than what it actually was in order to induce the subject's consent. While courts have come to different conclusions regarding the voluntariness of a consent, they have all emphasized the importance of the particular facts of the case. For example, in Carter, postal inspectors, who were investigating the disappearance of mail, placed several marked bills and a bearer check in the mail trays at the bank where the defendant worked as a mailroom employee. 884 F.2d at 369. After the inspectors identified the defendant as a possible suspect, he was summoned to the office of the bank president where he was interviewed by the inspectors. Id. The inspectors told the defendant that they were investigating the disappearance of Canadian money and asked whether they could look in the defendant's wallet. Id. The defendant complied, and the investigators discovered the marked items. Id. The Eighth Circuit held that the inspectors' deceptive statements as well as other circumstances, including the fact that the defendant underwent custodial interrogation, supported the district court's order suppressing the evidence. Id. at 375.
In Krause, the police fabricated a false story of a rape in order to search the suspects' residence for drugs. 206 S.W.3d at 923-24. In order to gain access to the residence, the police knocked on the door of the suspects at 4 a.m. and informed them that a young girl had just reported being raped by one of the occupants in the residence. Id. at 924. The police officer asked if he could look around the residence to determine whether her description of the residence was accurate. Id. Once inside, the police discovered drugs in "plain view." Id. However, the Kentucky Supreme *40 Court vacated the defendant's convictions and sentence, holding that the deception employed by the police was so unfair as to be coercive and that the consent to search was unconstitutionally invalid. Id. at 927-28. The court's belief that the consent to search was coerced was based on the following factors: (1) given the time and nature of the ruse, the defendant and his roommate were in a particularly vulnerable state; (2) the tactics were unnecessary and not based on pressing or imminent tactical considerations; and (3) if the type of ruse used by the police were sanctioned by the court, citizens would be discouraged from aiding in the apprehension of criminals. Id. at 926. The court emphasized that its holding was limited and narrow and noted that the distinguishing feature of the case compared to most other ruse cases was the fact that the police "exploited a citizen's civic desire to assist police in their official duties for the express purpose of incriminating that citizen." Id. at 927.
Even though the Kentucky court found that the use of such a ruse rendered the defendant's consent invalid, other courts have not found that this type of misrepresentation, taken in conjunction with other factors, invalidates consent to search. For example, in Andrews, federal agents who were executing a search warrant handcuffed the defendant and led him into his hotel room. 746 F.2d at 247. An agent advised the defendant that he was not under arrest but also advised the defendant of his Miranda[13] rights. Id. at 248. When the agents found a gun in the room, they asked the defendant if it was his. Andrews, 746 F.2d at 248. Although the defendant said it was not, he also stated that he owned two guns, which were at his home, and described one of them as being a sawed-off shotgun. Id. The agent asked the defendant if he would mind if the agent examined the shotgun, telling the defendant that a person fitting the defendant's description had been connected to robberies in which a sawed-off shotgun was used. Id. In fact, the agent's purpose in asking to inspect the shotgun was to establish the defendant's possession of firearms so that the defendant could be charged with illegal possession of a firearm by a felon. Id. The agents and the defendant drove separate cars to the defendant's home, where the defendant led the agents into his residence and produced the shotgun. Id. The agents seized the weapon, and the defendant was indicted for possession of a firearm by a convicted felon. Id. The defendant appealed, but the Fifth Circuit rejected his argument that the evidence should have been suppressed because it was obtained through fraud, trickery, and deception. Id. at 247. Although the Fifth Circuit acknowledged that misrepresentation is a factor to be considered in evaluating the circumstances surrounding consent, the court ultimately found that the defendant's consent was voluntary because he was not under arrest when he produced the gun, he voluntarily waived his Miranda rights, the agents had not forced him to produce the gun, and two hours passed between the initial consent and the actual production of the gun. Andrews, 746 F.2d at 249-50.
Similarly, in Zamora, a Colorado appellate court upheld the use of a ruse in which the police told a man suspected of kidnapping and sexually assaulting a child in his home that they wished to see the layout of his apartment to aid in their investigation of a domestic dispute at an adjacent apartment. 940 P.2d at 941. The defendant let the police inside, and the police observed that the apartment's layout and the empty *41 waterbed frame in the bedroom matched the victim's description. Id. The defendant was subsequently arrested and convicted for kidnapping and sexual assault. Id. On appeal, the defendant argued that his consent to the entry of his apartment was invalid because it was obtained through deception. Id. The court, however, found that the defendant's consent was voluntary based upon the totality of the circumstances. Id. at 942-43. The court reasoned that although the officers may have partially misrepresented their purpose, they were truthful in saying they desired to see the layout of the apartment. Id. at 943. The court also observed that the officers did not exceed the scope of the consent. Id.
Because the cases in which the police fabricated a crime in order to obtain a subject's consent are the most closely analogous to the instant case, the facts upon which those cases turn are of particular importance to the analysis of the instant case. For example, while Wyche was not in a particularly vulnerable state like the suspects in Krause, he was in custody for a violation of probation just as the suspect in Carter was in custody. See Wyche, 906 So.2d at 1143. In contrast to the suspect in Carter and to Wyche, the suspect in Zamora was never in police custody. Moreover, unlike the defendant in Andrews, who admitted he owned a shotgun before the agents ever told him about the alleged robberies in which a shotgun was used, Wyche never volunteered any information or a sample to the police before they informed him that he was a suspect in a fictitious burglary. See Wyche, 906 So.2d at 1143. Taken together, these cases support the conclusion in the instant case that Wyche's consent was not freely and voluntarily given.
I would also concur in Judge Ervin's observation in his dissent below that, historically, the case law finding police deception failing to negate consent has involved a factual misrepresentation of the circumstances under investigation rather than a complete fabrication of the basis under which the defendant gave consent:
In my judgment, the present case is a classic example of police overreaching that requires suppression of the DNA sample. The officer's deliberate misrepresentation was not a factual misstatement in an ongoing case in which appellant was a suspect, but its purpose was to delude him of his true position by informing him he was a suspect in a crime that had never been committed so that incriminating evidence might be obtained from him in an altogether unrelated case, which, as events developed, also revealed his non-complicity. It was not until the investigation of yet another unrelated case that the officer's deception bore fruit and a match was finally obtained. Such crime shopping, in my opinion, cannot be condoned in an ordered society.
Wyche, 906 So.2d at 1149 (Ervin, J., dissenting). I would agree with Judge Ervin's distinction between "police misstatements which delude a defendant as to the import of his or her confession, and are thus improper, and police misstatements of relevant facts, which can be proper." Id. at 1148 (Ervin, J., dissenting) (citing State v. Manning, 506 So.2d 1094, 1097-98 (Fla. 3d DCA 1987)). In other words, contrary to our caution in Thomas, the police here engaged in a technique calculated to trick or to delude the suspect as to his true position.
The First District majority in Wyche, while recognizing our holdings that not all deception will render a confession or a consent to search involuntary, failed to recognize any limitations on government misconduct or to recognize our cautions in *42 Johnson and Thomas, warning against "intentional deception" and "[t]echniques calculated to exert improper influence, to trick, or to delude the suspect as to his true position." Those cautions appear to apply precisely to the actions of the government in securing Wyche's consent.
Further, in addition to our cautions against the government's use of trickery and intentional deception in Johnson and Thomas, I would also agree with the "bottom-line" analysis of Judge Gross in his specially concurring opinion in McCord:
The bottom line in this consent case is, as Professor LaFave has written, that the test the court has applied is "to ask if the deception is `fair,' ... the question which must be asked under the Schneckloth formulation." Lafave, § 8.2(n). As the Court noted in Schneckloth:

there is no "ready definition of the meaning of `voluntariness'"; rather, that term merely reflects an accommodation between the need for effective enforcement of the criminal law and "society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness."
LaFave, § 8.2(n) (quoting Schneckloth, 412 U.S. at 224-25, 93 S.Ct. 2041).
McCord, 833 So.2d at 831-32 (Gross, J., concurring specially); accord People v. Daugherty, 161 Ill.App.3d 394, 112 Ill.Dec. 762, 514 N.E.2d 228, 233 (1987) (holding that under the circumstances, the deception was so unfair as to be coercive); Krause, 206 S.W.3d at 927 (finding that the deception employed by the police was so unfair and unconscionable as to be coercive). As noted above, I would conclude in this instance that the level of police trickery and use of intentional deception prevented Wyche's consent from constituting "the product of an essentially free and unconstrained choice by its maker" as required by Schneckloth's fairness analysis.

CONCLUSION
I would hold that consent is not voluntary where the government obtains it by intentionally and falsely informing a person in custody that the person is suspected of a completely fabricated crime. In the instant case, Wyche gave Investigator VanBennekom a saliva sample in direct response to the intentional misrepresentation that the DNA would be used to investigate a burglary at a supermarket, a nonexistent and completely fabricated crime. Because VanBennekom manufactured the crime, he intentionally misled the defendant and did not validly obtain the DNA sample with Wyche's voluntary consent.
Accordingly, because I would conclude that Wyche's consent was not "the product of an essentially free and unconstrained choice," I would quash the decision below, and would approve of the Fourth District's decision in McCord.
PARIENTE and LEWIS, JJ., concur.
LEWIS, J., dissenting.
Although upon first reading the majority opinion appears both persuasive and plausible, a more detailed analysis causes me great concern and leads me to disagree with the majority in several respects. In my dissent, I conclude that after proper analysis it is apparent that the broad and overly generalized holding of the First District in Wyche v. State, 906 So.2d 1142 (Fla. 1st DCA 2005), is simply incorrect in light of federal Fifth Amendment decisions and the derivative holding of Schneckloth v. Bustamonte, 412 U.S. 218, 225-26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), which adopted the Fifth Amendment voluntariness standard as the controlling paradigm for this Fourth Amendment consent-search context. The majority approves the decision of the First District below and *43 therefore bases its opinion upon a defective cornerstone. Such an edifice will not stand the test of time. As more fully explained, I dissent for the following reasons. First, the majority fails to consider a number of voluntariness factors (in addition to police deception), which were established during the suppression hearing and which militate in favor of the conclusion that Wyche did not voluntarily consent to the saliva-swab search here.[14] Second, in at least two decisions, the United States Supreme Court has found that affirmative police misrepresentations were relevant and sufficient to vitiate the voluntariness of a defendant's confession. Hence, in my view, the First District's absolutist, per se holding that "[d]eception does not negate" voluntariness is simply an inaccurate, bold overstatement that constitutes a faulty foundation upon which to craft a majority opinion. Furthermore, both federal and Florida decisions support the conclusion that police deception is a relevant voluntariness factor.
Third, the very nature of police coercion or duress isin the words of the United States Supreme Courtoften "subtle," "implied," and "psychological"; therefore, the First District's characterization of police coercion as inherently "overt and direct" ignores the plain language and import of the High Court's voluntariness decisions. Fourth and finally, the majority does not address or explain the varying significance of different types and gradations of police deception, and instead merely distinguishes two conflicting district court decisions (Wyche and State v. McCord, 833 So.2d 828 (Fla. 4th DCA 2002)). However, these conflicting decisions are irreconcilable with regard to the status vel non of police deception as a totality-based voluntariness factor. Therefore, the majority's failure to articulate a clear holding with regard to the relevance of police deception in determining voluntariness relegates the lower courts of this State to choosing between Wyche and McCord on the basis of which decision more closely resembles the facts of the given case. This is an exceedingly difficult, if not impossible, task given the numerous factual similarities between these decisions. Consequently, if I were to draft the majority opinion, I would quash the erroneous decision of the First District in Wyche, approve the decision of the Fourth District in McCord, and hold that police deception is a relevant voluntariness factor to be considered in light of "all the surrounding circumstances," as required by the United States Supreme Court's Schneckloth decision.

I. BACKGROUND
While I appreciate the practical reliance of the majority upon only the opinion of the First District to supply the facts for our consideration, my analysis of Wyche's suppression motion and the suppression-hearing transcript indicates that the factual account presented by the First District is lacking in several significant respects and fails to identify or sufficiently consider the following factors that militate in favor of an involuntariness finding: (1) intentional police fabrication of an extrinsic felony offense for the purpose of inducing the defendant's consent; (2) the defendant's custodial status and custodial interrogation; and (3) the apparent absence of warnings pursuant to Miranda v. Arizona, *44 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or explanation of the defendant's constitutional rights with regard to the consent. Moreover, while it does not provide a direct basis for my conclusion that we must reverse the erroneous decision of the First District, the complete record on appeal further confirms that the police investigators lacked a reasonable suspicion, probable cause, or any cause to detain or arrest the defendant concerning the Pink Magnolia burglary. Given the dispositive role that facts play in the totality-of-circumstances consent-search context, I believe that it is necessary to more fully describe the factual milieu involved in this case as actually disclosed by the suppression motion, the suppression-hearing transcript, and the record on appeal. In this case, the trial judge did not apply the required totality-of-circumstances test or consider any established voluntariness factors. Instead, the judge facially denied Wyche's motion to suppress. The dispositive, clear-cut facts of this case are present in the suppression materials, and the record on appeal further reveals the unconstitutional tactics that the police investigators used to coerce Wyche's consent to the saliva-swab search. I merely consider them within the confines of the proper legal inquirywhether Wyche's consent was voluntary based upon an analysis of "all the surrounding circumstances." Schneckloth, 412 U.S. at 226, 229, 93 S.Ct. 2041 (emphasis supplied).
Upon examination of the suppression materials and the record, it is apparent to me that little genuine investigative work occurred in this case. The majority's finding that Mr. Wyche voluntarily consented to the saliva-swab search based upon "all the circumstances" thus lends tacit approval to many questionable practices and calls into doubt the basis of our Anglo-American criminal justice system: "`[O]urs is an accusatorial and not an inquisitorial system' and ... accordingly, tactics for eliciting inculpatory [evidence] must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness." Miller v. Fenton, 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (emphasis supplied) (making this observation in a confession case; however, as stated in Schneckloth, the pre-Miranda voluntariness standard drawn from confession cases controls Fourth Amendment consent-search determinations) (quoting Rogers v. Richmond, 365 U.S. 534, 541, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961)); see also Reddish v. State, 167 So.2d 858, 863 (Fla. 1964). Further, the majority glosses over the fact that the "circumstances" of this case include the stipulated truth that a police detective fabricated an illusory, yet ostensibly valid felony offense for the express purpose of inducing an in-custody defendant's "consent." Cf. Lynumn v. Illinois, 372 U.S. 528, 529-34, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (police misrepresentation that a suspect would be deprived of state financial aid for her dependent children if she failed to cooperate with authorities rendered her subsequent confession involuntary); Spano v. New York, 360 U.S. 315, 320-23, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (coercive police behavior vitiated the voluntariness of the defendant's confession, a major component of which was a police fabrication, deception, or misrepresentation); Samuel v. State, 898 So.2d 233, 234-37 (Fla. 4th DCA 2005) (the police vitiated the voluntariness of the defendant's confession by inducing his self-incrimination through the use of fabricated robbery offenses and the promise that they would only charge the defendant with the robberies to which he confessed).

A. The Circumstantial-Evidence Case
The facts here emphasize the importance of the invalidly obtained saliva *45 swabs, which were the only items of evidence that enabled law enforcement to connect Mr. Wyche to the burglary involved in this case. The majority castigates me for considering facts not presented during the suppression hearing and inaccurately implies that the only relevant fact presented during the hearing was the bare allegation that the police investigators used trickery to obtain Wyche's DNA. Such allegations are contrary to the facts presented in the suppression materials. In relevant part, Wyche's suppression motion stated:
On December 11, 2001[,] Investigator VanBennekom was investigating an unsolved sexual assault and thought [Wyche] may be a suspect. After [Wyche] was arrested/detained by another officer on a warrant for a[n] [unrelated] violation of probation in Columbia County[,] ... Investigator VanBennekom gained [Wyche's] consent to give the saliva swabs through the use of trickery. During a deposition on September 29, 2003, Investigator VanBennekom stated that the courts had not prohibited the use of trickery at the time he spoke to [Wyche]. He stated that ... he told [Wyche] that he was a suspect in a [fictitious, yet ostensibly genuine] ... burglary at a Winn Dixie. The saliva swab was compared to the samples in Investigator VanBennekom['s] open sexual assault case, where no match was obtained, and at the request of Investigator Moody, Investigator VanBennekom also had FDLE[[15]] compare the swab samples to samples from a[n] [actual] burglary at the Pink Magnolia.
(Emphasis supplied.) Similarly, during the suppression hearing, counsel for Wyche stated:
Officer VanBennekom ... engaged in trickery in order to get [Wyche] to consent to a saliva swab.... [The sexual-assault] case that [Investigator] VanBennekom was actively investigating [was his concern], [and] he engaged in trickery in order to get Mr. Wyche to consent. VanBennekom was not actively investigating [the actual Pink Magnolia] burglary that we're here on. And the [Winn-Dixie] burglary that he used as a ruse in order to get Wyche to consent was a fictitious burglary.... [T]he alleged incident occurred on December 5th, 2001. While there may have been some suspicion that Mr. Wyche was involved, no warrant was obtained for him at that time. No warrant was obtained [by the Lake City Police] until ... they actually had the DNA. And that occurred roughly in October of 2002.... [T]hey took the DNA results on December 11th [of 2001], seven days after the alleged burglary [at the Pink Magnolia]. They used a ruse to get consent to take those [saliva swabs]. They filed them with FDLE. And roughly ten months later[,] they get the results. Only after they get those DNA results does a warrant go out for Mr. Wyche on this case. Had that been the product of an actual [investigative] discovery, they would have issued the warrant earlier on. But they didn't have any basis beyond vague tips and then the [supposed] connection with this blood.... [T]here are no eyewitnesses to put my client at the scene on th[e] day of this burglary, [there is only testimony]... that he had been employed there at a prior time.

(Emphasis supplied.) Thus, the suppression motion and hearing disclose the dispositive facts upon which my dissent rests: (1) Investigator VanBennekom affirmatively *46 deceived Wychean in-custody suspect who was detained with regard to an unrelated offenseby accusing him of a wholly fictitious, yet ostensibly valid and serious felony; (2) VanBennekom did so for the express purpose of inducing Wyche's consent either expressly or impliedly through the promise of exoneration; (3) the investigation with regard to Wyche's alleged involvement in the Pink Magnolia burglary was purely based upon speculative suspicion (i.e., "a hunch"), and not upon probable cause or, in my view, even an articulable suspicion; (4) the police investigators had nothing to tie Wyche to this case save for the invalidly obtained saliva swabs; and (5) the police "crime shopped" until they could tie Wyche's DNA to evidence obtained from some pending investigation. Instead of applying the requisite totality-of-circumstances voluntariness test, which requires a careful sifting of the unique facts of the case at bar, the trial court facially denied Wyche's suppression motion without supplying a single line of legal analysis. Further, this total lack of analysis was directly contrary to the binding, well-reasoned decision of the Fourth District in State v. McCord, 833 So.2d 828 (Fla. 4th DCA 2002), which Wyche had attached to his suppression motion.
As explained in my analysis, the facts disclosed during the suppression hearing are sufficient under governing doctrine to warrant the suppression of the saliva-swab evidence in this case. I merely reference additional facts that are present in the record to further communicate the fundamental significance of this dissent: the deceptive police practices endorsed by the majority are contrary to established Fourth and Fifth Amendment precedent, and, if continued, this type of inquisitorial misadventure will lead to the wholesale abandonment of a central aspect of our accusatorial system.
The factual background that follows is a complete summary of this case. In Lake City, Florida, on either the night of December 4, 2001, or during the early-morning hours of December 5, 2001, someone burglarized a local gift boutique known as the Pink Magnolia. It appears that the perpetrator threw an ornamental duck through a window at the front of the store to gain entry and removed what amounted to sixteen to twenty pieces of 10- and 14-carat gold jewelry, each piece valued at under $100.00. Joyce Lookingbill, a sales clerk, reported the break-in. Officer Mike Adams was the first to respond and the scene was secured. However, the next law enforcement officer to arrive, Investigator Joseph M. Moody, testified that no other officers were present when he arrived and Officer Adams was summoned to return to the Pink Magnolia. Based on his trial testimony, Investigator Moody arrived at the shop between 8:30 and 9 a.m. He entered the shop and collected three samples of what appeared to be drops of blood scattered at various points from the front door of the shop to immediately behind the sales counter. According to a later FDLE analysis, only two of the three samples actually contained blood. Investigator Moody did not take pictures of the crime scene and did not label the individual blood samples to show the location from which they were recovered within the Pink Magnolia; instead, he merely numbered them sequentially based upon what he described as his path from the front door to the sales counter. Other than the testimony of Investigator Moody, there is no clear indication in the record with regard to where the blood was actually located within the shop.
Mr. Wyche was a day laborer who had performed yard work at the Pink Magnolia on two or three occasions. He testified below that while he was performing work at that location he cut his hand pulling weeds and, after doing so, entered the *47 Pink Magnolia to request that the owner supply him with gloves. Wyche did not travel more than several feet into the shop when he requested the gloves, so the lack of photographs and evidence-location labels becomes important, as the absence of those items prevented the State from definitively establishing where the sampled blood was located within the Pink Magnolia.
There were never any fingerprints recovered from the Pink Magnolia, there were no eye witnesses to the crime, and there is no indication in the record that the police interviewed anyone other than the shop's owner and employees. The jewelry was never recovered, and Investigator Moody neither questioned Mr. Wyche nor recovered any evidence from Wyche. The only significant event contained in the record that led Investigator Moody to include Wyche as a person of interest in the Pink Magnolia burglary was an anonymous phone call received by a Sergeant Ostendorf. Evidently, Sergeant Ostendorf then contacted Investigator Moody and related to Moody the details of the anonymous phone call. The caller allegedly stated that Wyche was in the north end of Lake City attempting to sell jewelry and that Wyche was cut on his arm and bleeding. However, it is important to note that when Moody attempted to corroborate the anonymous tip, he discovered that Wyche was not on the north end of Lake City and that he was not attempting to sell jewelry in that vicinity.[16] Consequently, on this record, the police lacked probable cause, a reasonable, articulable suspicion, or any cause to arrest or detain Mr. Wyche for questioning concerning the Pink Magnolia burglary. See, e.g., State v. Maynard, 783 So.2d 226, 229 (Fla.2001) ("Because an anonymous caller's basis of knowledge and veracity are typically unknown, these tips justify a stop only once they are `sufficiently corroborated' by police." (emphasis supplied) (quoting Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990))); J.L. v. State, 727 So.2d 204, 207 (Fla.1998), aff'd, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) ("An anonymous tip can provide the basis for an investigatory stop when the tip, as corroborated by independent police work, exhibits sufficient indicia of reliability to furnish police with a reasonable suspicion that the defendant is engaged in criminal activity." (emphasis supplied) (quoting Butts v. State, 644 So.2d 605, 606 (Fla. 1st DCA 1994))); Illinois v. Gates, 462 U.S. 213, 241-46, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (emphasizing the importance of police corroboration of anonymous tips in creating the probable cause necessary to secure a search warrant).

B. The Invalid Acquisition of the Saliva Swabs and the Erroneous Admission of this Evidence
On December 11, 2001 (six to seven days after the Pink Magnolia burglary), Lake City police officers approached and arrested Mr. Wyche on the basis of then-active, unrelated warrants. Once the police took Wyche into custody, he was transported to a police station and Investigator Clint VanBennekom subjected him to custodial interrogation.[17] Based on the record before *48 us, Investigator VanBennekom lacked probable cause, a reasonable, articulable suspicion, or any cause to arrest or detain Mr. Wyche with regard to the Pink Magnolia burglary. See, e.g., Maynard, 783 So.2d at 229. Further, as the State and defense counsel have stipulated, Investigator VanBennekom testified under oath during his September 29, 2003, depositionwhich occurred approximately two weeks before Wyche's trialthat he intentionally lied to Mr. Wyche by accusing him of a fabricated burglary for the purpose of inducing Wyche to consent to a saliva-swab search. Cf. United States v. Montoya, 760 F.Supp. 37, 39-40 (E.D.N.Y. 1991) ("[O]fficers cannot use a ruse to gain access unless they have more than mere conjecture that criminal activity is underway." (emphasis supplied) (quoting United States v. Maldonado Garcia, 655 F.Supp. 1363, 1367 (D.P.R.1987))); 1 Criminal Practice Manual § 25.91 (Thomson-West 2008 ed.) ("One prerequisite common to all of these [deception-induced] searches is that the police must have a reasonable basis to believe criminal activity is ongoing in the place to be searched; they cannot simply be on a `fishing' expedition." (emphasis supplied)). VanBennekom was actually investigating an unrelated sexual-assault case, and the record contains no indication that he possessed probable cause, a reasonable, articulable suspicion, or any cause whatsoever to justifiably believe that Wyche committed that offense, nor is there any indication that VanBennekom questioned Wyche with regard to that offense. In fact, Wyche's genetic material exonerated him with regard to the sexual assault. The major theme of this case the apparent lack of genuine, honest investigative workstarkly contrasts with the readily identifiable presence of police fishing expeditions, or as Judge Ervin stated in his dissenting opinion below"crime shopping." Wyche, 906 So.2d at 1149 (Ervin, J., dissenting).
It was VanBennekom's goal to bait Wyche with the evanescent, false hope of exonerating himself with regard to a fabricated, yet ostensibly valid and serious felony offense. Cf. United States v. Carter, 884 F.2d 368, 375 (8th Cir.1989) (police deception, ruses, and misrepresentations "may be considered along with other factors as part of the totality of circumstances"); United States v. Bosse, 898 F.2d 113, 115 (9th Cir.1990) ("Special limitations apply when a government agent obtains entry by misrepresenting the scope, nature or purpose of a government investigation. `[A]ccess gained by a government agent, known to be such by the person with whom the agent is dealing, violates the fourth amendment's bar against unreasonable searches and seizures if such entry was acquired by affirmative or deliberate misrepresentation of the nature of the government's investigation.'" (emphasis supplied) (quoting United States v. Little, 753 F.2d 1420, 1438 (9th Cir.1984))). Investigator VanBennekom never questioned Mr. Wyche concerning the Pink Magnolia burglary and never informed Wyche that he was a suspect with regard to that offense. Moreover, Investigator *49 Moodyperhaps unintentionally aided in the concealment of VanBennekom's fabrication by stating in a sworn complaintdated October 2, 2002that "[Wyche] was arrested and brought to the police station and interviewed by Inv. C. Vanbennekom. [Wyche] denied any knowledge of the crime and gave two swab saliva sample's [sic] to Inv. Vanbennekom who then turned them over to me." (Emphasis supplied.) Moody was investigating the Pink Magnolia burglary and the sworn complaint related to that crime, while VanBennekom was "investigating" a fabricated burglary case and an actual sexual-assault case. Hence, Moody's sworn complaint inaccurately and misleadingly insinuated that Wyche was questioned with regard to the Pink Magnolia burglary, that he denied his involvement, and that he voluntarily consented to a saliva-swab search.[18] This characterization of that interrogation was and is simply false.
The fraudulent subterfuge having failed with regard to the sexual-assault case, Investigator VanBennekomwithout probable cause, articulable suspicion, or any justifiable basisthen transferred the saliva swabs to Investigator Moody, who in turn submitted the swabs to FDLE for DNA analysis in comparison to the two blood samples recovered from the Pink Magnolia. Moody submitted the swabs on December 27, 2001, a little over two weeks after VanBennekom's deceptive custodial interrogation of Wyche. Investigator Moody received the FDLE test results on October 2, 2002, which disclosed a match between the invalidly obtained saliva swabs and the two Pink Magnolia blood samples. In sum, Investigator Moody without any discernable, genuine investigative work"got lucky" in the "crime-shopping spree" then unfolding at the Lake City Police Department.
Also noticeably absent from the record is any indication that Mr. Wychean in-custody suspectwas informed of his Miranda rights, that he executed a consent-search form, or that he was otherwise informed of his constitutional rights. While none of these factors are dispositive under Schneckloth, they are nevertheless well-established considerations that inform a totality-of-circumstances voluntariness inquiry and are simply not addressed in the majority's analysis. See, e.g., United States v. Watson, 423 U.S. 411, 424-25, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (identifying whether the defendant received proper Miranda warnings and whether the defendant knew he or she could withhold his or her consent as relevant voluntariness factors); United States v. Davis, 749 F.2d 292, 296 (5th Cir.1985) (identifying "the defendant's awareness of his right to refuse to consent to the search" as a relevant voluntariness factor); United States v. Juarez, 573 F.2d 267, 274 (5th Cir.1978) (identifying receipt of proper Miranda warnings and knowledge of the constitutional right to refuse consent as relevant voluntariness factors); United States v. Worley, 193 F.3d 380, 386-87 (6th Cir. 1999) (substantially similar). We do, however, have Investigator VanBennekom and the State's bold claim that VanBennekom was justifiably ignorant of the fact that police deception is a factor which contributes to involuntary consents and confessions. Below, during argument on the motion to suppress, the State relied on Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), to justify this protestation of ignorance; however, even that case recognized that some types and gradations of police deception may suffice *50 to render a confession involuntary. See id. at 739, 89 S.Ct. 1420. Although in Frazier, the High Court held that an instance of intrinsic police deception[19] did not vitiate the voluntariness of the defendant's confession under the totality of circumstances present in that case, see id.,[20]Frazier does not stand for the unsubstantiated legal proposition that the police possess carte blanche to deceive suspects into relinquishing their constitutional rights under all circumstances. See id.; see also Schneckloth, 412 U.S. at 225, 93 S.Ct. 2041 (noting that the police do not possess "carte blanche to extract what they can from a suspect"); Lynumn, 372 U.S. at 529-34, 83 S.Ct. 917 (police misrepresentation with regard to financial assistance to, and custody of, suspect's children rendered suspect's incriminatory statements involuntary); Spano, 360 U.S. at 320-23, 79 S.Ct. 1202 (misrepresentation by the suspect's childhood frienda police officerthat the friend would lose his job as a law enforcement officer if the suspect failed to cooperate rendered the suspect's incriminatory statements involuntary).
It is constitutionally mandated that we follow federal Fourth Amendment jurisprudence; specifically, that of the United States Supreme Court. See art. I, § 12, Fla. Const. Further, Schneckloth's voluntariness test is a derivative doctrine drawn from Fifth Amendment confession jurisprudence. See 412 U.S. at 225-26, 93 S.Ct. 2041. Thus, I do not find it unreasonable or unnecessarily burdensome for this Court to require that the law enforcement personnel of this State possess at least a rudimentary understanding that not all instances of police deception are permissible under federal Fourth and Fifth Amendment doctrine. Florida law enforcement personnel, in my view, are sophisticated, talented, and well advised and informed. The Federal Bureau of Investigation does not appear to entertain any doubts on this subject, and that agency provides the following guidance to its special agents: "Use of physical force or threats ... will render a consent involuntary. Likewise, fraud, deceit, or misrepresentation will taint the consent. But a consent to enter, obtained by such means in an undercover operation is proper." FBI, Legal Handbook for Special Agents § 5-4.5, at 19 (photo. reprint 2003) (copy on file with Florida Supreme Court Library) (emphasis supplied).[21] As *51 explained below, much if not all of the federal case law that the Legal Handbook undoubtedly relied upon predates the events of this case, most of which occurred during 2001 and 2002. However, even if VanBennekom and his colleagues were unaware of applicable federal case law, our own confession case law and other Florida decisions, many of which predate 2001, consider the type and extent of police deception a relevant voluntariness factor. If we are to remain faithful to our duty to protect the constitutional rights of the citizens of this State, we cannot hold Florida's police officers to a lesser standard of required knowledge.
Wyche officially became a suspect in the Pink Magnolia burglary on October 2, 2002. He was later arrested on April, 7, 2003, was arraigned on April 15, 2003, and pled not guilty in response to a three-count information.[22] On October 14, 2003, Wyche submitted a timely motion to suppress the saliva swabs, which he predicated upon the Fourth District's then-binding McCord opinion. The motion to suppress was timely under Florida Rule of Criminal Procedure 3.190(h)(4), despite the trial court's facial ruling to the contrary. The rule merely states that "[t]he motion to suppress shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court may entertain the motion or an appropriate objection at the trial." Fla. R.Crim. P. 3.190(h)(4) (emphasis supplied). Here, defense counsel was not aware of the fact that Investigator VanBennekom had fabricated a felony offense to induce Wyche's consent to the saliva-swab search until September 29, 2003, which was a mere fifteen days before defense counsel submitted Wyche's motion to suppress on October, 14, 2003. Moreover, defense counsel submitted the motion to suppress before the jury was sworn and before jeopardy had attached. This timeframe included ten business days,[23] which is well within the reasonably required amount of time to properly research and draft a motion to suppress. Jury selection also took place during this timeframe, further accounting for defense counsel's supposed delay in submitting the motion to suppress. In my view, the facial denial of the motion to suppress as untimely did not comport with the dictates of rule 3.190(h)(4).
*52 Similarly, the motion to suppress did not seek retroactive application of case law. Since at least the mid-to-late 1970s, police deception has been a relevant voluntariness factor for federal courts in applying a Schneckloth totality analysis, and this Court is bound by our State Constitution to interpret and apply federal Fourth Amendment doctrine. See, e.g., Schneckloth, 412 U.S. at 226-49, 93 S.Ct. 2041 (mandating that the totality-based voluntariness test include examination and consideration of "all the surrounding circumstances" (emphasis supplied)); United States v. Bosse, 898 F.2d 113, 115 (9th Cir.1990) (identifying police deception as a relevant voluntariness factor); United States v. Carter, 884 F.2d 368, 370-71 (8th Cir.1989) (same); United States v. Andrews, 746 F.2d 247, 250, 250 n. 4 (5th Cir.1984) (same), abrogated on other grounds by United States v. Hurtado, 905 F.2d 74, 75 (5th Cir.1990); United States v. Griffin, 530 F.2d 739, 742-43 (7th Cir. 1976) (same); United States v. Hrdlicka, 520 F.Supp. 403, 409 (W.D.Wis.1981) (same).[24] Further, confession cases from the United States Supreme Court and from Florida's appellate courts hold that the type and extent of police deception is a relevant voluntariness factor to consider under the totality of circumstances. See, e.g., Frazier, 394 U.S. at 739, 89 S.Ct. 1420; Lynumn, 372 U.S. at 529-34, 83 S.Ct. 917; Spano, 360 U.S. at 320-23, 79 S.Ct. 1202; Johnson v. State, 660 So.2d 637, 642 (Fla.1995); Thomas v. State, 456 So.2d 454, 458 (Fla.1984); Brewer v. State, 386 So.2d 232, 235-36 (Fla.1980); Chambers v. State, 965 So.2d 376, 378 (Fla. 4th DCA 2007) ("[W]e reach the inescapable conclusion that Chambers'[ ] confession which almost immediately ensued from what was essentially a promise not to charge him with a `fictional' murder if he told the truth rendered his recorded statement and confession unconstitutional as coerced and involuntary." (emphasis supplied)); State v. Cayward, 552 So.2d 971, 973-75 (Fla. 2d DCA 1989), review dismissed, 562 So.2d 347 (Fla.1990); Samuel, 898 So.2d at 234-37.[25]
*53 The State's final two bases for requesting "facial" denial of the motion to suppress were equally tenuous: (1) the defendant voluntarily consented to the saliva-swab search because the trial court and trial counsel were allegedly certain beyond cavil that the defendant knew he committed a burglary,[26] just not the fabricated crime the police admittedly used to induce his consent; and (2) even if the trial court had granted the defendant's motion to suppress, the State could have compelled him to provide genetic samples pursuant to a rule of criminal procedure and, therefore, the State would inevitably have discovered the defendant's DNA. First, as explained in the analysis section below, police deception did induce Wyche's consent to the saliva-swab search. Logically, in this type of situation, suspects who know that they are innocent as to the felony of which they stand accused will submit to saliva-swab "consent" searches and correspondingly surrender their Fourth Amendment rights to avoid remaining a suspect with regard to a fabricated, yet ostensibly genuine felony offense. See, e.g., John Wesley Hall, Jr., Search and Seizure § 8.3, at 488 (3d ed. 2000) ("[T]he police well know that too many innocent citizens will give up their rights and consent to a search not knowing they have a right to refuse and thinking that `I have nothing to hide so why not get this over with and go on?'").
Second, counsel for the State misconstrued the inevitable-discovery doctrine and the exclusionary rule by claiming that even if the trial court had granted the motion to suppress, the State could then simply have required that Mr. Wyche provide additional "blood, hair, and other materials of the defendant's body [involving] no unreasonable intrusion thereof." Fla. R.Crim. P. 3.220(c)(1)(G). This argument assumes the very component it lacksthe independent existence of probable cause, a reasonable, articulable suspicion, or any justifiable basis to suspect Wyche of having committed the Pink Magnolia burglary. Under the inevitable-discovery doctrine, the State bears the burden of establishing that "the evidence would ultimately have been discovered by legal means." Maulden v. State, 617 So.2d 298, 301 (Fla.1993) (emphasis supplied). On this record, Investigator Moody did not have any reliable basis to suspect the defendant with regard to the Pink Magnolia burglary until after he received the very evidence which should have been suppressed. His only real leadthe anonymous phone callwas wholly uncorroborated, was in fact dispelled by subsequent investigation, and was insufficient as a matter of law.
Hence, little in the way of explanation is needed with regard to why Wyche became an official suspect in the Pink Magnolia burglary as of October 2, 2002. That was the same date on which Investigator *54 Moody received the DNA analysis results from FDLE. Without the invalidly obtained saliva swabs, the Lake City police would not have had any basis beyond a legally insufficient "hunch" to consider the defendant a suspect with regard to the Pink Magnolia burglary. Cf. Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (contrasting "specific reasonable inferences" with an "inchoate and unparticularized suspicion or `hunch'"). Without the improper evidence, there would not have been any inevitable discovery. The very evidence that is properly subject to suppression may not serve as the cornerstone of the State's inevitable-discovery claim. See, e.g., Bumper v. North Carolina, 391 U.S. 543, 548 n. 10, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) ("Any idea that a search can be justified by what it turns up was long ago rejected in our constitutional jurisprudence. `A search prosecuted in violation of the Constitution is not made lawful by what it brings to light....'" (quoting Byars v. United States, 273 U.S. 28, 29, 47 S.Ct. 248, 71 L.Ed. 520 (1927))); Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (substantially similar). Rule 3.220(c)(1) does not modify this result. That rule merely permits the State to require that the defendant provide samples of genetic material "[a]fter the filing of the charging document and subject to constitutional limitations [.]" (Emphasis supplied.) No information would ever have been filed in this case had it not been for the invalidly obtained saliva swabs, and the above-mentioned "constitutional limitations" language subjects rule 3.220(c)(1) to this Court's interpretation of the demarcated limits of the Fourth Amendment.
Despite the evident merit of Wyche's motion to suppress, the trial judge, with only the most perfunctory explanation, stated that "the motion is denied ... I want to be very clear on the record[,][i]f this state had not filed their motiontheir reply to the motion, asking that it be denied on its face, I still would have grantedI would have denied the motion to suppress." In this explanation, the trial judge did not even purport to apply the requisite totality-of-circumstances test, did not list what, if any, voluntariness factors he considered, and did not so much as suggest that he consulted the Fourth District's McCord decision, which was then-binding precedent for the trial court, and which Wyche relied upon and attached to his motion to suppress. During the course of the trial, Wyche lodged at least three specific, contemporaneous objections to the admission of the saliva swabs and DNA evidence, which the trial court similarly overruled.[27] After completion of the trialwhich began and concluded on October 15, 2003the jury convicted Wyche as to all three counts of the information. On November 12, 2003, the trial court imposed a ten-year sentence as to Counts I and III, credited Wyche with 220 days time served, and ordered a five-year term of probation as to Count II. The trial court also adjudicated Wyche a habitual felony offender under section 775.04, Florida Statutes.
On appeal, the First District issued a broad opinion with sweeping language, which affirmed the denial of the motion to suppress and held that deception is largely if not totally irrelevant for purposes of conducting a voluntariness inquiry. See Wyche, 906 So.2d at 1144 (holding without qualification that "[d]eception does not negate consent"). In my view, the decision of the First District, which the majority *55 approves and builds upon, is distinguishable and out of step with the majority of federal and Florida decisions concerning the appropriate consideration of police deception within a totality-of-circumstances voluntariness inquiry. The First District's per se, absolutist approach that deception and coercion are mutually exclusive is inconsistent with both the mandate of Schneckloth to consider all of the relevant circumstances and with the recurrent recognition of the United States Supreme Court that coercion may be subtle and psychological in addition to overt and physical. See, e.g., Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960) (noting that "coercion can be mental as well as physical" (emphasis supplied)); Haynes v. Washington, 373 U.S. 503, 515, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) ("The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases ... where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused." (emphasis supplied)).

C. Our Task in this Case
In this case, we confront a decisive doctrinal crossroads. We are called upon to choose between two diametrically opposed approaches. On the one hand, we have the overly broad and simply incorrect per se approach articulated by the First District in Wyche, which essentially holds that all varieties and gradations of police deception are simply irrelevant in determining whether an alleged consenter freely and voluntarily relinquished his or her Fourth Amendment protection against unreasonable searches and seizures. In other words, according to the First District, "[d]eception does not negate consent." Id. at 1144; but cf. United States v. Drayton, 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) ("[F]or the most part per se rules are inappropriate in the Fourth Amendment context. The proper inquiry necessitates a consideration of `all the circumstances surrounding the encounter.'" (emphasis supplied) (quoting Florida v. Bostick, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991))).
On the other hand, we have a pragmatic, case-by-case approach articulated by the Fourth District in McCord, which upholds the totality-of-circumstances approach and stands for the proposition that the type and level of police deception present in a given case is a relevant voluntariness factor to consider under Schneckloth and under the lower federal court precedent applying that decision. See McCord, 833 So.2d at 830 ("[T]he use of police trickery may result in the exclusion of the confession depending upon the level of trickery employed." (emphasis supplied) (citing Thomas v. State, 456 So.2d 454, 458 (Fla. 1984))). As explained below, it is my conclusion that only a pragmatic, case-by-case inquiry, which deems police deception a relevant consideration, comports with the Schneckloth totality-of-circumstances test and preserves the palpable distinctions that should exist between our accusatorial system and the type of unreasonable police inquisition that occurred in this case.

II. ANALYSIS

A. Police Fabrication and the Totality of Circumstances
In Schneckloth v. Bustamonte, the High Court held that its Fifth Amendment confession cases supply the totality-of-circumstances test that is required to determine the voluntariness of consent searches, while also holding that no single factor represents a "controlling criterion." 412 U.S. at 225-29, 248, 93 S.Ct. 2041. Schneckloth thus drew upon and adopted *56 an already existing line of Fifth Amendment voluntariness decisions, which included Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), and Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). Spano and Lynumn each considered affirmative police deception or fabrication a relevant voluntariness factor, and in each decision, the High Court ultimately concluded that the affirmative police misrepresentations, along with other relevant factors, vitiated the voluntariness of the defendant's incriminatory statements. See Lynumn, 372 U.S. at 529-34, 83 S.Ct. 917; Spano, 360 U.S. at 320-23, 79 S.Ct. 1202. Relatedly, Schneckloth and half a century of confession cases have recognized that police coercion may be "implied," "subtle," and "psychological." See, e.g., Schneckloth, 412 U.S. at 226-29, 93 S.Ct. 2041; Haynes, 373 U.S. at 515, 83 S.Ct. 1336; Blackburn, 361 U.S. at 206, 80 S.Ct. 274. Therefore, the First District's per se assertions that (1) "[d]eception does not negate consent," (2) deception and coercion are mutually exclusive, and (3) that coercion is "by its nature... overt and direct" are, in my view, incorrect statements of the law in light of United States Supreme Court precedent. Wyche, 906 So.2d at 1144. Schneckloth itself did not involve any police deception, and the High Court did not attempt to delineate a comprehensive list of relevant voluntariness factors; instead, the Court indicated on several occasions that any voluntariness inquiry, whether in the Fourth or Fifth Amendment context, must include a careful case-by-case "sifting" of "the totality of all the surrounding circumstances." 412 U.S. at 226-27, 229, 233, 248-49, 93 S.Ct. 2041 (emphasis supplied). Based upon common sense and prior High Court confession decisions, this fact-intensive standard would necessarily include consideration of any affirmative misrepresentations made by the police in an attempt to influence a suspect's decision to confess or consent to a search. Such a recognition also furthers society's "deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." Spano, 360 U.S. at 320-21, 79 S.Ct. 1202.
Schneckloth stands equally for the proposition that society's fundamental sense of "fairness" is a guiding consideration in determining voluntariness. Id. at 225, 93 S.Ct. 2041. For example, it is generally fair in terms of due process for the police to mislead a suspect regarding the extent of evidence then in police possession concerning the offense the suspect knows the police are actually investigating (i.e., intrinsic fabrication). In the confession context, this is the type of police deception that this Court and the United States Supreme Court have previously held does not by itself per se vitiate voluntariness. See, e.g., Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (holding that the fact that police falsely told defendant that his companion had confessed to the crime under investigation, though relevant, was insufficient to render otherwise voluntary confession inadmissible); Burch v. State, 343 So.2d 831, 833 (Fla.1977) (substantially similar holding addressing "failed polygraph" ruse). This form of police deception is fair because it is similar to merely bluffing in a poker game: it does not compel suspects to incriminate themselves any more than a large bet in a poker game compels an opponent to believe that the betting player has a stronger hand and that he or she should correspondingly fold.
On the other hand, when the police induce consent by fabricating an extrinsic felony offense and then claim that the *57 suspect can clear him- or herself by submitting to a DNA test, the police have unfairly crossed the due-process fundamental-fairness line that the Supreme Court has drawn in its confession and consent-search cases. See Colorado v. Connelly, 479 U.S. 157, 163, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ("[B]y virtue of the Due Process Clause `certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned.'" (emphasis supplied) (quoting Miller v. Fenton, 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985))); Lynumn, 372 U.S. at 529-34, 83 S.Ct. 917; Spano, 360 U.S. at 320-23, 79 S.Ct. 1202.[28] This is the proper conclusion in the type of extrinsic-fabrication case currently before the Court because such a fabrication essentially dangles a compelling false promise[29] before the suspect, which is a circumstance the High Court has previously held impacts a voluntariness inquiry. See Bram v. United States, 168 U.S. 532, 543, 557-58, 18 S.Ct. 183, 42 L.Ed. 568 (1897) (holding that promises, inducements, and improper influences on the part of the police are relevant voluntariness factors); Arizona v. Fulminante, 499 U.S. 279, 285-86, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (disapproving the "but-for" test articulated in Bram, but leaving intact the holding that promises, inducements, and improper influences are relevant voluntariness factors).
This is completely different in terms of fairness from honestly informing a suspect of the offense the police believe he or she committed and then misrepresenting the extent or quality of the inculpatory evidence (i.e., intrinsic fabrication). Assuming the absence of other improper police coercion (e.g., sleep deprivation, truth-serum administration, or extensive interrogation while refusing rest or breaks), generally only a guilty suspect would confess when faced with intrinsic fabrication. See, e.g., State v. Kelekolio, 74 Haw. 479, 849 P.2d 58, 71-74 (1993). Contrastingly, even innocent suspects will likely submit to consent searches and correspondingly surrender the cherished right of privacy *58 the Fourth Amendment protects to avoid remaining a suspect with regard to an extrinsic, fabricated, and yet ostensibly genuine felony offense. See, e.g., John Wesley Hall, Jr., Search and Seizure § 8.3, at 488; § 8.17, at 525-26 (3d ed. 2000 & Supp.2007); 29 Am.Jur.2d Evidence § 744 (2008) ("Whether deception renders a confession involuntary depends upon whether the deception interjected the type of extrinsic considerations that would overcome a defendant's will by distorting an otherwise rational choice of whether to confess or remain silent." (emphasis supplied) (citing Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963))).
Of additional concern is the fact that because consent searches do not require probable cause or even a reasonable, articulable suspicion,[30] decisional affirmation of instances of extrinsic police deception has the perverse effect of encouraging police fishing expeditions. To combat these fishing expeditions, some courts have imposed the requirement that police officers possess a reasonable, articulable suspicion that a crime is afoot before resorting to a ruse, fabrication, or deception to obtain consent to search. See, e.g., United States v. Montoya, 760 F.Supp. 37, 39-40 (E.D.N.Y.1991) ("[O]fficers cannot use a ruse to gain access unless they have more than mere conjecture that criminal activity is underway." (quoting United States v. Maldonado Garcia, 655 F.Supp. 1363, 1367 (D.P.R.1987)); State v. Ahart, 324 N.W.2d 317, 319 (Iowa 1982) ("[N]ot all warrantless entries gained by ruse are valid. Certainly, such an entry is not allowable if it is arbitrary." (emphasis supplied)). In Wyche, the police investigators apparently lacked probable cause, an articulable suspicion, or any legal cause with regard to Wyche concerning each of the crimes they claimed to have been investigating (i.e., the fabricated Winn-Dixie burglary, the sexual assault, and the Pink Magnolia burglary).[31] Although it is a question the United States Supreme Court has not explicitly addressed, it appears that the voluntariness cases in which it has approved some form of police deception or misrepresentation have involved suspects that the police suspected of committing crimes based upon reasonably specific, articulable facts. See, e.g., Frazier, 394 U.S. at 737-38, 89 S.Ct. 1420 (suspect arrested on the basis of probable cause and subjected to police *59 questioning with regard to an actual murder investigation). Thus, based upon my research, the United States Supreme Court does not appear to have either approved or disapproved the requirement that police officers at a minimum possess a reasonable, articulable suspicion before resorting to ruses, deception, or fabrications to obtain a suspect's consent to a search. Therefore, in cases involving police deception and ruses, this Court should consider the lack of reasonable suspicion or probable cause a factor militating against voluntariness because this type of behavior is a significant part of the totality of all circumstances leading to the alleged consent search or confession.
Recognizing police fabrication as an important factor that informs Schneckloth's totality-based voluntariness inquiry is a conclusion that comports with the majority of existing federal precedent. Further, the failure to recognize police deception as a voluntariness factor is not in keeping with Schneckloth's command to consider "all the circumstances" bearing upon voluntariness. See Schneckloth, 412 U.S. at 226-27, 229, 233, 248-49, 93 S.Ct. 2041 (emphasis supplied).[32] In contrast, the First District's holding, which the majority approves, states that deception is largely if not totally irrelevant to a voluntariness inquiry and, consequently, is an outlier which is out of step with the majority of existing case law. In Wyche, police deception is actually but one factor to consider in addition to other factors that are also pertinent considerations under existing case law (factors that the First District declined to explore). The facts of Wyche evidence the following relevant voluntariness factors in addition to the mere existence of police deception: (1) the type and extent of the police deception concededly present; (2) the continuing question with regard to whether the defendant was informed of his Miranda rights or any constitutional rights; (3) whether the defendant was in custody and subjected to police questioning; (4) whether the police possessed probable cause or a reasonable, articulable suspicion to suspect the defendant of having committed the offenses they claimed to have been investigating; and (5) from confession jurisprudence, whether the police offered the defendant any promises overt or impliedto induce his acquiescence to the search.
However, contrary to Schneckloth's command to take all relevant circumstances into account, the majority approves and expands upon the decision of the First District, which enunciated a per-se, absolutist rule that "[d]eception does not negate consent." Wyche, 906 So.2d at 1144. Moreover, the United States Supreme Court cases the First District relied upon in support of this overbroad holding are inapposite to the issue of whether police deception as to the purpose of a consent search may bear upon Schneckloth's totality-of-circumstances inquiry. See Wyche, 906 So.2d at 1144 (citing, e.g., Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952)). The important and contextually necessary explanation that the First District neglected to include is that Hoffa, Lewis, and On Lee represent a very distinct doctrinal line.
Those cases merely stand for the recognized, prosaic rule of law that one engaged in criminal wrongdoing who voluntarily exposes that wrongdoing to a supposed co-conspirator or criminal confederate assumes *60 the risk that the supposed ally is actually an undercover government agent or is an individual who will report this wrongdoing to the appropriate law enforcement authorities. See Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 8.2(m) at 127 (4th ed.2004). These decisions do not address the situation in which police officers have a defendant in custody and then fabricate an extrinsic felony offense for the express purpose of inducing the defendant, through an express or implied promise of exoneration, to consent to a search of the defendant's bodily fluids. We must recognize that Hoffa, Lewis, and On Lee present a different juridical state of affairs than the circumstances currently confronting this Court in Wyche. Compare LaFave, supra, § 8.2(m), at 124-32 "Deception as to identity," with § 8.2(n), at 133-41 "Deception as to purpose" (distinguishing between situations "where the consenting person is unaware of the fact that the other party is a law enforcement officer or one who has already agreed to act on behalf of a law enforcement agency, [and] that in which some form of deceit or trickery is practiced by a person known to be a federal, state, or local official").
The holding of the First District wipes away the consideration of deception as a relevant voluntariness factor by distinguishing the federal precedent referenced in McCord, and by relying upon a distinguishable decision from the Third District. See Wyche, 906 So.2d at 1144-48 (citing Miami-Dade Police Dep't v. Martinez, 838 So.2d 672, 673-75 (Fla. 3d DCA 2003) (holding consent valid under the totality of circumstances where police allegedly misrepresented that they were only looking for weapons, not currency, and where consenter was not in custody, and was not offered the false hope of exoneration with regard to a completely fabricated offense), review dismissed, 851 So.2d 729 (Fla. 2003)). In my opinion, this approach is a selective identification of cases to support an outcome-determinative predilection instead of a proper consultation of the wider breadth of existing, persuasive precedent addressing the issue before us. The First District simply did not consider all of the federal and state precedent indicating that police deception is a relevant factor to consider with regard to the presence of compulsion. For that reason alone, the majority should disapprove the First District's reasoning even if the majority ultimately holds that Wyche's consent was voluntary under the totality of circumstances. The type and extent of police fabrication is a recognized factor under a totality-based inquiry, and the vast majority of courts addressing the issue have not enunciated the First District's absolutist mandate that the presence or absence of police deception does not bear upon that determination of whether the defendant's confession or consent to search was compelled or involuntary.
In contrast to the approach of the First District, the intrinsic-versus-extrinsic framework is not a per se rule. Rather, there are situations in which the fabrication is admittedly extrinsic to the crime the police are actually investigating but where the defendant's consent is nevertheless voluntary under the totality of circumstances. For example, post-Schneckloth, in United States v. Andrews, the Fifth Circuit stated that "any misrepresentation by the Government is a factor to be considered in evaluating the [totality of] circumstances," but went on to hold that the defendant's consent was voluntary despite the presence of extrinsic police fabrication. 746 F.2d at 247-51 (emphasis supplied). There, law enforcement personnel misrepresented the fact that they wanted to examine the defendant's shotgun to determine if it matched the characteristics of a *61 weapon used in a series of robberies, when in fact the officers sought to establish the defendant's status as a felon in possession of a firearm. 746 F.2d at 248. However, unlike Wyche, there were numerous voluntariness factors which abated the police misrepresentation present in Andrews: (1) pre-misrepresentation, the defendant had already volunteered his status as a gun owner; (2) the defendant was not in custody when he initially consented to produce the shotgun or later when he actually produced the weapon; (3) the defendant was told that he was free to go after the police completed their search; and (4) the police had provided the defendant with Miranda warnings, and he had voluntarily waived his related rights. See id. Here, Wyche never volunteered his alleged connection with the actual police investigation involved in this case (i.e., the Pink Magnolia burglary), there is no indication that the police informed him of his rights with regard to the DNA sample, Wyche was decidedly in police custody and subjected to police questioning before he consented to the search, and the police expressly or impliedly promised Wyche that he could exonerate himself with regard to a completely fabricated, yet ostensibly valid felony offense. These are all relevant factors under a totality-of-circumstances inquiry. See also Brown v. Brierley, 438 F.2d 954, 957-59 (3d Cir.1971) (pre-Schneckloth, extrinsic-fabrication decision holding that a police officer's partial misrepresentation of purpose did not vitiate the voluntariness of the defendant's consignment of a firearm to the officer for the purpose of sale); People v. Avalos, 47 Cal.App.4th 1569, 55 Cal.Rptr.2d 450, 453-57 (1996) (holding that where the police partially misrepresented the purpose of their search but possessed reasonable, articulable suspicion, if not full-blown probable cause, that the defendant was distributing methamphetamines, an extrinsic, partial misrepresentation as to purpose did not negate consent). Therefore, when considering the type and extent of police deception involved in each individual case, some extrinsic-fabrication cases will nonetheless result in findings of voluntariness under Schneckloth's totality test. However, that is not the proper result here given the facts present in Wyche and McCord.

B. The Totality-of-Circumstances Test Applied to Wyche

In Wyche, law enforcement, for all intents and purposes, promised the suspect that he could clear his name in the fabricated burglary case by submitting a saliva sample (a fact which the majority concedes by quoting the facts from the First District's decision below). See majority op. at 24.[33] This promise induced Wyche to consent to the saliva-swab search, and absent this affirmative fabrication, Wyche would in all probability have refused to consent. In both Wyche and McCord, the police *62 essentially confronted the defendants with the following fabricated state of affairs you are a suspect in a potentially serious felony investigation, and you have two options: (1) refuse to submit to a saliva-swab search and thereby remain a viable suspect with regard to this felony investigation; or (2) if you are confident in your innocence, submit to the saliva-swab search and exonerate yourself as to this suspected felony as almost any person who knows that he or she is innocent of these allegations would do. Wyche and McCord are thus archetypal extrinsic-fabrication cases.
Moreover, the confession cases the majority relies upon are wholly distinguishable. Many of these confession cases involve situations where the police lie to the suspect by falsely claiming that a codefendant has already confessed and implicated the suspect, so the suspect might as well come clean. See, e.g., Frazier, 394 U.S. at 739, 89 S.Ct. 1420; Burch, 343 So.2d at 833 (substantially similar, but involving "failed polygraph" ruse). Even in those cases that do not involve this precise species of misrepresentation, the misrepresentation is still intrinsic to the case the police are actually investigating. See, e.g., Escobar v. State, 699 So.2d 988, 994 (Fla. 1997) (holding that "[p]olice misrepresentation alone does not necessarily render a confession involuntary," in the context of a case where police allegedly misrepresented that they possessed physical evidence of the crime at issue), abrogated on other grounds by Connor v. State, 803 So.2d 598, 605-07 (Fla.2001); Fitzpatrick v. State, 900 So.2d 495, 511 (Fla.2005) (citing Escobar for the proposition that "police misrepresentations alone do not necessarily render a confession involuntary," but rendering this holding in the context of a case in which the police investigator misrepresented the extent of the inculpatory evidence in the case he was actually investigating); Davis v. State, 859 So.2d 465, 472 (Fla.2003) (confession voluntary despite law enforcement's characterization of the situation confronting the defendant as a "missing-person case"; the detectives accurately informed the defendant of the identity of the missing person and simply neglected to inform him that they already knew the victim was dead); Nelson v. State, 850 So.2d 514, 521-22 (Fla.2003) (holding confession voluntary despite police misrepresentation of the then-unknown inculpatory nature of the applicable DNA evidence). In short, the common theme linking each of these confession casesa theme conspicuously absent in cases like Wyche and McCordis that the alleged police misrepresentations related to the cases the police were actually investigating, a fact of which the defendants in those cases were well aware.
Conversely, in Wyche, Investigator VanBennekom intentionally fabricated an extrinsic burglary offenseof which the defendant knew he was completely innocentfor the purpose of presenting the defendant with the Hobson's choice of either consenting to the search and thereby clearing his name, or refusing to consent and thereby remaining a viable suspect with regard to the ostensive burglary case. The above-referenced confession cases, upon which the majority opinion relies, are thus distinguishable because unlike Wyche they do not involve lies that were based upon extrinsic inducements for the suspect to offer evidence in the false hope that the suspect could clear him- or herself of culpability for a completely fabricated offense. See majority op. at 28 (relying upon this litany of distinguishable intrinsic-fabrication cases).
I similarly disagree with the majority's heavy reliance upon Washington v. State, 653 So.2d 362, 364-65 (Fla.1994), because *63 that case assumes the presence of validly obtained DNA samples, which evades the very question at issue in Wyche: Did the police validly obtain Petitioner Wyche's saliva sample? In Washington, this Court merely held that once a suspect's DNA samples are "validly obtained" the police are not restrained from using those samples in other cases. 653 So.2d at 364-65 (emphasis supplied). The decisive distinguishing factor is that Washington did not involve any police fabrications; rather, the police suspected the defendant of unrelated murder and sexual-battery offenses and requested that he consent to providing hair and blood samples with regard to the actual, valid sexual-battery case. The police merely decided not to inform Washington of the murder case, which is not a distinction without a difference. The extrinsic fabrication at issue in Wyche renders this difference dispositive because in Washington, the police did not offer the defendant the false hope of exonerating himself with regard to a completely fabricated, yet ostensibly valid felony offense; instead, they were investigating Washington concerning two clearly valid offenses. This distinction is determinative because in addressing the totality-based question of voluntariness, confession-case jurisprudence often relies upon the presence of false police promises and affirmative police misrepresentations.
This distinction also exposes the State's doomsday-like premonitions as the paper tigers that they actually arethere is no requirement that the police inform a potential consenter of the purpose of their desire for a consent search, further there is no rule of law that compels the police to disclose every crime for which they are investigating a suspect. See Respondent's Answer Brief at 10-11 (contending that if this Court were to hold that police deception vitiated consent in Wyche, this holding would require police to disclose all actual investigations to a potential consenter); cf. Colorado v. Spring, 479 U.S. 564, 576 & n. 8, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) ("This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is `trickery' sufficient to invalidate a suspect's waiver of Miranda rights, and we expressly decline so to hold today.... [However,] [i]n certain circumstances, the Court has found affirmative misrepresentations by the police sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege." (emphasis supplied) (citing Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959))). Recognizing that silence does not necessarily equate with trickery does not lead to a conclusion that this Court must approve the very different situation in which the police intentionally fabricate an offense for the express purpose of engendering the false hope of exoneration in the suspect and thereby obtain his or her consent.
In sum, the approach, reasoning, and conclusion of the current majority opinion are suspect for the following reasons: (1) the majority overlooks the importance of false police promises in confession cases and glosses over the fact that police deception remains a relevant factor under a totality-based inquiry; (2) it never explores the potentially dispositive distinction between different types of police deception, which appears to be a necessary exercise given that the relevant test requires consideration of "all the circumstances" bearing upon voluntariness; (3) it does not address the fact that in the confession context, the United States Supreme Court has held that affirmative police misrepresentations may vitiate voluntariness; and (4) the majority indicates that it could only find lack of consent in *64 this case based upon "the sole fact" of police misrepresentation (this claim overlooks the other multiple voluntariness factors at issue in this case).
Additionally, even under the totality analysis presented in the majority opinion, the correct result should be that Wyche's consent was involuntary. The majority's attempted distinction between Wyche and McCord on the ground that McCord involved a fabricated sexual battery rather than a fabricated burglary is, in my opinion, wholly unconvincing. Why should the type or degree of the fabricated felony matter when in fact all felony offenses may cause serious and at times life-altering repercussions for a criminal defendant? Compare majority op. at 31 ("McCord's being told that he was a suspect in a serious sex crime for which DNA could clear him is a circumstance relevant to the analysis of whether McCord's consent was voluntary or coerced that distinguishes McCord from the instant case." (emphasis supplied)), with Petitioner's Brief on the Merits at 10 (Wyche received a ten-year sentence for the Pink Magnolia burglary charge, which is hardly a non-serious or trivial crime given the sentence and its related repercussions (e.g., habitual-offender status for Mr. Wyche)). I fail to see that this is a valid basis for distinguishing McCord and Wyche.
When a police detective falsely informs an individual who is currently confronted with the "inherently coercive" atmosphere of custodial interrogation[34] that the individual is suspected of having committed a felony offensewith all its attendant negative stigmas (e.g., potentially lengthy incarceration, large fines, and suspension of civil rights)of which the individual knows he or she is completely innocent, the type of fabricated felony is largely irrelevant. Thus, even the majority analysis should have led to a holding that Wyche's consent was involuntary under the totality of circumstances. McCord and Wyche are not validly distinguishable: each defendant submitted to a saliva test in the misplaced hope that their DNA would clear them as a suspect with regard to an admittedly fabricated yet ostensibly valid felony offense, when in actuality the police intended to use the defendants' DNA to inculpate them with regard to undisclosed, unrelated criminal investigations.

III. CONCLUSION
Here, under "the totality of all the surrounding circumstances," the police fabrication was extrinsic to the crime actually under investigation (i.e., the type of fabrication), the fabrication completely misrepresented the crime under investigation (i.e., the extent of the fabrication), and the police offered this fabrication to an in-custody individual to engender the false hope of clearing himself with regard to an offense that both he and the police knew that he did not commit. This renders each of the confession cases relied upon in the majority opinion distinguishable because those cases involved misrepresentations intrinsic to the crime under investigation and further did not involve the false police enticement that a defendant could clear his or her name concerning a completely fabricated offense.
Only a pragmatic, case-by-case inquiry, which deems police deception a relevant voluntariness consideration, comports with the Schneckloth totality-of-circumstances test and sustains our accusatorial system of justice. Thus, given the proper totality *65 of circumstances, some forms of police deception may vitiate consent. In particular, such a holding is in keeping with Schneckloth's totality test because certain forms of police deception represent "an instrument of unfairness" that "poses a real and serious threat to civilized notions of justice." 412 U.S. at 225, 93 S.Ct. 2041; see also Krause v. Commonwealth, 206 S.W.3d 922, 923-28 (Ky.2006) (following Schneckloth totality standard and holding defendant's consent to search involuntary where police fabricated an extrinsic rape case), cert. denied, ___ U.S. ___, 127 S.Ct. 2975, 168 L.Ed.2d 703 (2007). Each police-fabrication case should be decided based upon its own facts in keeping with the totality test, but the facts of Wyche and McCord are so egregious and so similar that, in my opinion, each defendant's consent was rendered involuntary.
The per se approach of the First District is simply incorrect: police deception is a relevant voluntariness factor. Therefore, I would quash the decision of the First District in Wyche v. State, 906 So.2d 1142 (Fla. 1st DCA 2005), and approve the decision of the Fourth District in State v. McCord, 833 So.2d 828 (Fla. 4th DCA 2002), which articulates and adopts the appropriate case-by-case analysis.[35] Finally, I take this occasion to remind lower courts, such as the First District below, that "the State has the burden of proving that the necessary consent was ... freely and voluntarily given," Washington, 653 So.2d at 364 (quoting Reynolds v. State, 592 So.2d 1082, 1086 (Fla.1992)), and that "[i]t is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be obsta principiis [`resist the first encroachments']." Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746 (1886), abrogated in part by Warden v. Hayden, 387 U.S. 294, 301-10, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).
Accordingly, I dissent.
ANSTEAD and PARIENTE, JJ., concur.
NOTES
[1] In its summary of the facts of this case, the First District erroneously stated that Investigator Moody was investigating a robbery of The Pink Magnolia. Wyche, 906 So.2d at 1143. The record indicates that The Pink Magnolia case was a burglary investigation, not a robbery investigation. In Wyche's motion to suppress and the State's reply to the motion to suppress, both parties state that Wyche's saliva swabs were used to investigate the burglary of The Pink Magnolia. Moreover, Wyche was charged and convicted of burglary and grand theft, not robbery.
[2] The trial court's order does not state the grounds upon which the defendant's motion was denied and the State's motion was granted. McCord had been decided at the time of the hearing on the motion to suppress. McCord had not been decided at the time Investigator VanBennekom obtained Wyche's consent. The State argued that the investigator could not have been bound to follow McCord since it had not been decided at the time of the consent search. The First District did not rule on that issue, and we likewise do not decide it. The State also argued that the motion was untimely because it was not filed by the defendant in time to be heard before jury selection had started. Again, like the First District, we do not decide this timeliness issue because we hold that the defendant's motion was properly denied on its merits.
[3] U.S. Const. amend. IV.
[4] Though Justice Lewis's dissent extensively discusses facts that were not before the trial court at the suppression hearing, we do not do so because at that hearing counsel for both Wyche and the State agreed that the motion could be heard on the basis of stipulated facts orally presented by the attorneys. Most notably, there was nothing presented to the trial court at the suppression hearing that accused, as the dissent does, the Lake City Police Department of being on a "crime shopping spree." Lewis, J., dissenting op. at 49.
[5] As defense counsel admits in Wyche's initial brief to this Court, defense counsel did not believe there was a legal basis for filing a motion to suppress the samples on the basis of voluntariness until counsel discovered the McCord decision.
[6] We have also recognized that a confession is not voluntary where the totality of the circumstances reveals that the police used improper influence to overpower the will of the defendant. In Thomas v. State, 456 So.2d 454, 458 (Fla. 1984), we stated:

A confession that is obtained by coercion may not be used in evidence. Techniques calculated to exert improper influence, to trick, or to delude the suspect as to his true position will also result in the exclusion of self-incriminating statements thereby obtained. To render a confession inadmissible, however, the delusion or confusion must be visited upon the suspect by his interrogators; if it originates from the suspect's own apprehension, mental state, or lack of factual knowledge, it will not require suppression.
(Citations omitted.) However, in Thomas, as here, we ultimately found that the defendant's confession was voluntary because there was no evidence of threats, promises, or other improper influences. Id.
[7] Justice Lewis errs in stating that the majority concedes that "law enforcement, for all intents and purposes, promised [Wyche] that he could clear his name in the fabricated burglary case by submitting a saliva sample." Lewis, J., dissenting op. at 61. We rely on the stipulated facts, which do not indicate that Investigator VanBennekom promised or even implied that Wyche could clear his name by submitting a saliva sample. The record is silent on this point.
[8] The First District erroneously described the crime at the gift shop as a robbery. See Wyche, 906 So.2d at 1143. In fact, the record reveals that Investigator Moody was investigating a burglary at the gift shop.
[9] The trial court issued its order denying Wyche's motion to suppress on October 15, 2003, and McCord had been decided on December 11, 2002, almost a year earlier. The trial court in Wyche was legally bound to follow the Fourth District's decision in McCord. See Pardo v. State, 596 So.2d 665, 666 (Fla. 1992) (noting that "[t]he decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by this Court" and concluding that "in the absence of interdistrict conflict, district court decisions bind all Florida trial courts" (quoting Stanfill v. State, 384 So.2d 141, 143 (Fla. 1980), and citing Weiman v. McHaffie, 470 So.2d 682, 684 (Fla. 1985))).
[10] In Escobar v. State, 699 So.2d 988 (Fla. 1997), abrogated on different grounds, Connor v. State, 803 So.2d 598 (Fla.2001), we affirmed the trial court's denial of the defendant's motion to suppress his confession where "police detectives deluded him before he gave his statements by falsely stating that they had obtained physical evidence and by failing to inform him that he could be sentenced to death." Id. at 994. In Davis v. State, 859 So.2d 465 (Fla.2003), we held a confession voluntary even though the defendant claimed police officers deceived him by informing him that they were investigating a missing person's case when in fact it was a murder investigation. Id. at 472. Similarly, we held a confession voluntary when an investigator wrote "DNA evidence" on a "pro and con" list on a board while interrogating him. Nelson v. State, 850 So.2d 514, 521-22 (Fla.2003). In that case, DNA analysis had not yet been performed but evidence had been obtained for DNA testing; therefore this Court found that the statement was sufficiently ambiguous and upheld the confession. Id. at 522. In Burch v. State, 343 So.2d 831 (Fla. 1977), we upheld the admission of a confession where the police misrepresented to the defendant that the defendant's partner in crime had confessed. Id. at 833. In Fitzpatrick, this Court upheld a trial court's denial of a motion to suppress a defendant's statements where a detective suggested to the defendant that he would be able to arrange a satellite system to show the defendant was at the scene of the crime. 900 So.2d at 511.
[11] Based upon the "totality of the circumstances" test adopted in Schneckloth, other courts have also considered police deception to be a relevant factor in evaluating the voluntariness of consent. See United States v. Carter, 884 F.2d 368, 375 (8th Cir.1989) (explaining that deception may be considered along with other factors); United States v. Davis, 749 F.2d 292, 294 (5th Cir.1985) (noting that any misrepresentation by the government is a factor (citing United States v. Andrews, 746 F.2d 247, 250 (5th Cir.1984))); People v. Zamora, 940 P.2d 939, 942 (Colo.Ct.App.1996) (observing that deception is one factor to be considered in assessing the totality of the circumstances); State v. Reinier, 628 N.W.2d 460, 469 (Iowa 2001) (finding that comments by police constituting a "subtle form of deception" weighed against a conclusion that the consent was voluntary); Krause v. Commonwealth, 206 S.W.3d 922, 926 (Ky.2006) (determining that the consent to search was coerced based upon several factors).
[12] The United States Supreme Court has never addressed how a government official's deception as to the purpose of the official's action or investigation may affect the voluntariness of an individual's consent to a search. See 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(n), at 133 (4th ed.2004).
[13] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[14] Voluntariness inquiries are heavily fact-intensive and case-specific. Accordingly, I primarily address the additional voluntariness factors in the factual-background section of this dissenting opinion. Furthermore, the trial proceedings, while not a direct basis for my suggested reversal of the decision of the First District, provide additional confirmation of the evident constitutional dilemma created by the police investigators in this case.
[15] The Florida Department of Law Enforcement.
[16] In response to a defense motion in limine, the State agreed not to reference the anonymous tip during the trial proceedings.
[17] The circumstances surrounding any allegedly voluntary confession or consent to search include whether the purported confessor or consenter is subjected to custodial interrogation. See, e.g., Bram v. United States, 168 U.S. 532, 558, 18 S.Ct. 183, 42 L.Ed. 568 (1897) ("[A]s one of the circumstances, such imprisonment or interrogation may be taken into account in determining whether ... the statements of the prisoner were voluntary."); United States v. Watson, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (identifying custodial status as one relevant, non-dispositive voluntariness factor, and contrasting consents given while in custody in a public place from those given within the "confines of [a] police station" (emphasis supplied)); United States v. Carter, 884 F.2d 368, 370-71, 375 (8th Cir.1989) (identifying custodial atmosphere and police interrogation as relevant voluntariness factors); cf. Moran v. Burbine, 475 U.S. 412, 426, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) ("[T]he Court has recognized that the interrogation process is `inherently coercive' and that, as a consequence, there exists a substantial risk that the police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion." (emphasis supplied)).
[18] The police report reiterates this same misleading characterization of the interrogation of Mr. Wyche but adds that "no other information was found." (Emphasis supplied.)
[19] "Intrinsic" and "extrinsic" refer to whether the fabricated facts relate to the offense the suspect knows the police are actually investigating ("intrinsic fabrication") or, in contrast, to facts outside of and unrelated to the offense the police are actually investigating ("extrinsic fabrication").
[20] After recounting the voluntariness factors present in Frazier(1) the defendant received a partial warning with regard to his constitutional rights; (2) the questioning was of short duration; and (3) the defendant was mature and of normal intelligencethe Court held that "[t]he fact that the police misrepresented the statements that [the defendant's cousin] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible. These cases must be decided by viewing the `totality of the circumstances,' and on the facts of this case we can find no error in the admission of petitioner's confession." 394 U.S. at 739, 89 S.Ct. 1420 (emphasis supplied) (citation omitted).
[21] The Legal Handbook certainly does not carry the independent force of law, but its goal is to provide an accurate summary of the federal law that FBI agents must follow in conducting federal investigations. See id. § 0-1, at 1. The legal summaries presented in the text are "based on [United States] Supreme Court decisions or, in those areas where the Supreme Court has not addressed a particular legal issue, on an analysis of lower federal court decisions." Id.

In prior cases, the United States Supreme Court has relied upon the experience of the FBI in rationalizing the existence of the exclusionary rule. For example, in Elkins v. United States, 364 U.S. 206, 218-19 n. 8, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), the High Court rebuffed the contention that the exclusionary rule had rendered federal law enforcement ineffective by quoting the comments of former FBI Director J. Edgar Hoover. The observations of the Director remain apropos here given Investigator VanBennekom's intentional deception of Wyche for the purpose of inducing his relinquishment of the constitutional right to be free from unreasonable searches and seizures:
One of the quickest ways for any law enforcement officer to bring public disrepute upon himself, his organization and the entire profession is to be found guilty of a violation of civil rights. Our people may tolerate many mistakes of both intent and performance, but, with unerring instinct, they know that when any person is intentionally deprived of his constitutional rights those responsible have committed no ordinary offense. A crime of this nature, if subtly encouraged by failure to condemn and punish, certainly leads down the road to totalitarianism.
364 U.S. at 220 n. 8, 80 S.Ct. 1437 (emphasis supplied) (quoting FBI Law Enforcement Bull., Sept. 1952, at 1-2).
[22] The State charged Mr. Wyche with burglary of a structure (section 810.02, Florida Statutes (2001)) (Count I), third-degree grand theft (section 812.014(2)(c)1., Florida Statutes (2001)) (Count II), and criminal mischief (section 806.13, Florida Statutes (2001)) (Count III).
[23] Ten business days not including the day on which defense counsel submitted the motion to suppress to the trial court (i.e., October 14, 2003).
[24] See also United States v. Esquivel, 507 F.3d 1154, 1159 (8th Cir.2007) (identifying a non-exhaustive list of Schneckloth voluntariness factors and including inter alia: "whether the police made promises or misrepresentations"); United States v. Laine, 270 F.3d 71, 75 (1st Cir.2001) (identifying the absence of police "trickery" as a voluntariness factor); United States v. Lace, 669 F.2d 46, 52 (2d Cir.1982) (identifying "the absence of any deception, coercion, or other overreaching on the part of the police" as a voluntariness factor); Brown v. Brierley, 438 F.2d 954, 957-59 (3d Cir. 1971) (considering police deception as a relevant issue, but ultimately finding consent valid under the circumstances); Vizbaras v. Prieber, 761 F.2d 1013, 1014-15, 1017 (4th Cir. 1985) (holding that no intentional police misrepresentation occurred); United States v. Buchanan, 904 F.2d 349, 355 (6th Cir.1990) ("The government has the burden of showing that consent was not contaminated by any duress, coercion, or trickery." (emphasis supplied)); United States v. Sanchez-Jaramillo, 637 F.2d 1094, 1098 (7th Cir. 1980) ("[The defendant] presented no evidence that agents made any threats or promises to affect his judgment, nor are there claims of any other form of coercion or misrepresentation." (emphasis supplied)); United States v. Wellins, 654 F.2d 550, 557 (9th Cir. 1981) (noting that "there were no threats or misrepresentations made which would have induced [the defendant's] consent" (emphasis supplied)); United States v. Smith, 199 Fed.Appx. 759, 763, 2006 WL 2645113 (11th Cir.2006) (unpublished opinion) ("The record indicates that [the police officer] did not attempt to coerce or intimidate [the defendant] into consenting to the search. On the contrary, [the officer] and [the defendant's] interaction appears to have been polite and cooperative. Nor did [the officer] misrepresent the situation to [the defendant]." (emphasis supplied)).
[25] The majority attempts to factually distinguish Lynumn, Spano, and Samuel. See majority op. at 30-31. However, the majority fails to appreciate the significance of my reliance upon these and other police-misrepresentation decisions. I reference these decisions because they clearly demonstrate that the presence, type, and extent of affirmative police misrepresentation constitutes a relevant voluntariness factor, not because they bear an uncanny factual resemblance to the case at bar. As the United States Supreme Court stated in Schneckloth, every voluntariness case is inherently unique and, consequently, such cases demand a "careful sifting of the unique facts and circumstances of each case." Schneckloth, 412 U.S. at 233, 93 S.Ct. 2041 (emphasis supplied). The effort of the majority to factually distinguish these cases does not, and cannot, alter the jurisprudential premise that police deception is a relevant factor to consider within the totality of all the circumstances present in a given consent-search or confession case.
[26] Counsel for the State overlooked the fact that he presented this contention before any proof of Wyche's involvement with the Pink Magnolia burglary had been establishedno evidence had been presented, no witnesses had testified, and in fact, the jury had not even been sworn.
[27] Wyche renewed this objection for a fourth time in a subsequent motion for new trial, which the trial court denied on December 1, 2003.
[28] Cases that do not follow the general predictive parameters of the intrinsic-versus-extrinsic framework are either distinguishable based on the totality of circumstances or, in my opinion, were incorrectly decided. See, e.g., United States v. Andrews, 746 F.2d 247, 247-48 (5th Cir.1984) (defendant, felon-in-possession, volunteered his status as a gun owner before the police ever mentioned to him that he was a suspect in a fabricated burglary investigation; further, defendant was not in custody); People v. Zamora, 940 P.2d 939, 941-44 (Colo.Ct.App.1996) (holdingincorrectly in my opinionthat consent was voluntary where police used extrinsic fabrication to gain admittance to defendant's apartment). However, at a minimum, Zamora is distinguishable for at least two reasons: (1) in that case, the defendant was not in custody; and (2) the police did not offer the defendant the completely illusory promise of clearing himself with regard to a totally fabricated, yet ostensibly valid felony offense (the police merely stated that they wished to examine the interior of the defendant's apartment to aid in the investigation of a domestic dispute which purportedly involved an adjacent apartment). See id. at 941-42.
[29] I disagree with the contention of the majority that Wyche does not involve any police "promises." See majority op. at 29 n. 6 ("However, in Thomas, as here, we ultimately found that the defendant's confession was voluntary because there was no evidence of threats, promises, or other improper influences." (emphasis supplied)). The investigator's accusation of an in-custody suspect with a completely fabricated felony offense along with the implied or perhaps even explicit promise of the opportunity for exoneration of a crime that the suspect knew he did not commit is a "promise" under my reading of the state and federal confession cases. Judge Ervin's dissent below and Justice Anstead's dissent here express similar views.
[30] United States v. Cruz-Mendez, 467 F.3d 1260, 1265 (10th Cir.2006) (holding that consent searches do not require probable cause to justify the search of a home); United States v. Simpson, 259 Fed.Appx. 164, 165, 2007 WL 4320658 (11th Cir. Nov.30, 2007) (unpublished decision) ("[I]n the absence of probable cause or reasonable suspicion, law enforcement officers may search an individual or his property without a warrant, so long as the individual voluntarily consents to the search. (emphasis supplied)).
[31] If this were a game of baseball, a .333 average might not be such a bad thing, but when the police lack any discernable basis to investigate an individual already in custody on unrelated charges, they fabricate a felony offense to induce consent to a DNA test, and they then test the DNA for apparently baseless crime after apparently baseless crime and "get lucky" with regard to one, it yields support to the cynicism with which some citizens and even Supreme Court Justices have viewed the criminal justice system. As Justice Frankfurter observed in opposition to an instance of perceived police misconduct:

Of course criminal prosecution is more than a game. But in any event it should not be deemed to be a dirty game in which `the dirty business' of criminals is outwitted by `the dirty business' of law officers. The contrast between morality professed by society and immorality practiced on its behalf makes for contempt of law. Respect for law cannot be turned off and on as though it were a hot-water faucet.
On Lee v. United States, 343 U.S. 747, 758-59, 72 S.Ct. 967, 96 L.Ed. 1270 (1952) (Frankfurter, J., dissenting) (emphasis supplied).
[32] See note 11, supra, and accompanying text.
[33] The majority contends that I "err" by recognizing its concession to the fact that Investigator VanBennekom used the hope of exoneration to induce Wyche's alleged "consent." See majority op. at 30 n. 7. However, the majority quotes and relies upon the following factual description from the decision of the First District: "VanBennekom had manufactured the fictitious Winn-Dixie burglary in order to obtain Wyche's consent to take swabs for a sexual-assault investigation." Majority op. at 24 (emphasis supplied) (quoting Wyche, 906 So.2d at 1143). Thus, in response to the assertion of the majority that the record is silent as to Investigator VanBennekom's motive for intentionally misleading Wyche, I would rhetorically ask, "What other conceivable purpose could Investigator VanBennekom have had?" The facts of this case do not support any other motive than that ascribed to VanBennekom explicitly in my dissent and implicitly in the majority opinion: the investigator baited Wyche into "consenting" to the saliva-swab search with the promise of exoneration concerning a fabricated, yet ostensibly valid felony offense.
[34] Miranda, 384 U.S. at 458, 86 S.Ct. 1602 (identifying "the compulsion inherent in custodial surroundings").
[35] The United States Supreme Court exercises definitive control over the proper approach for this type of Fourth Amendment case. Should the defendant so desire, and should the High Court see fit, the Supreme Court possesses discretionary jurisdiction to review the decision of the majority concerning this federal question. See U.S. Const. art. III, § 2; 28 U.S.C. § 1257(a) (2000).